In the Matter of Deborah HAWKINS, Debtor.

Bankruptcy No 83 B 10680.

United States Bankruptcy Court, S.D. New York.

Sept. 29, 1983.

Kresky, Sinawski & Hollenberg, New York City, for debtor; Cathy Hollenberg, New York City, of counsel.

Jeffrey Sapir, Yonkers, N.Y., for Standing Chapter 13 Trustee.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

## INTRODUCTION

The debtor, Dr. Deborah Hawkins, seeks this Court's confirmation of her Chapter 13 percentage repayment plan pursuant to § 1325 of the Bankruptcy Code, 11 U.S.C. 1325 ("the Code"). At the confirmation hearing, the debtor proposed a modification of her original repayment plan increasing the amount and number of payments to $200 per month for five years. This plan, as modified, would yield approximately a 12% return on unsecured debts totalling $83,179.44.[1]

---

1. No creditor appeared at the hearing to object to confirmation. One creditor, the State of Maine, included such an objection in its proof of claim. The Chapter 13 Standing Trustee in this district, as amicus curiae, objected to confirmation.

## I

Dr. Hawkins, a native of Maine, received a Bachelor of Science degree, majoring in biology, from the University of Illinois in 1974. Unable to finance her undergraduate studies, she obtained a government-insured educational loan. After graduation, she returned to her home state of Maine where she lived with her family and taught school for one year. During that time, she paid back most of her undergraduate loan, leaving a balance of $1,324.58 which is now outstanding.

Dr. Hawkins had long desired to become a veterinarian. Veterinarian schools apparently give preference to residents of states in which they are located. Maine lacked a state university veterinarian school. It, however, had contracted with the University of Pennsylvania ("Penn") to reserve seats for qualified Maine residents. For each seat filled by a Maine resident, the State paid $32,000 to Penn. The Maine residents who were accepted by Penn to occupy these reserved seats would then contract with the State, either to reimburse it for the $32,000 by payment of annual increments of $1,600 over twenty years following employment or, in the alternative, to return to Maine to practice as veterinarians in Maine for four years.

Dr. Hawkins applied for admission to Penn for admission in 1976 under the auspices of Maine's program. Upon being accepted, she agreed to reimburse the State either through payment or service as described above, thus incurring a $32,000 debt now included in the repayment plan presented to the Court.

During her four years at Penn, Dr. Hawkins obtained five additional student loans. The first installment payment for each loan and her outstanding undergraduate loan and the debt to the State, became due one year after graduation.[2] Having married a New York resident before graduating, she decided to begin her career in New York rather than to return to Maine and absolve her debt to that state by serving as a veterinarian there for four years.

Unable to find employment in New York, she accepted a one-year volunteer internship which ended in July of 1981. She thereupon encountered some difficulties in her personal life. A medical condition forced her to leave work for a two-week stay in the hospital and her marital relationship began to deteriorate. She also claims to have suffered from a nervous condition during that time.

Despite these adversities, Dr. Hawkins successfully completed her internship in July, 1981, and immediately obtained a veterinarian position at an annual salary of $30,000. That financial success was ameliorated, however, as the first installment of all seven of her loans became due. She claims that she was unable to pay back these debts because her husband deserted her, leaving bills for her to pay, and that she was confused and upset.

She did apply for a hardship discharge of her $25,000 loan from Penn. Her application, however, was denied.

In the period before filing her Chapter 13 petition, Dr. Hawkins made several attempts to reorganize her debts on a consensual basis, the most recent of which was in February, 1983, when she proposed a 100% repayment plan to her seven creditors. Penn flatly refused to negotiate and responded by bringing an action against Dr. Hawkins seeking judgment for $25,000 (tuition loan) and $8,000 (legal fees). No response was received from any other creditor. Upon the advice of her attorney, Dr. Hawkins decided to seek relief under Chapter 13 of the Bankruptcy Code and has presented a plan to repay a percentage of her debts over a five-year time period, after which she would receive a discharge of

---

**2.** Dr. Hawkins' seven loans are:
- a) American Veterinary Medical Association Foundation – student loan . . . . . . . . . . . . . $ 2,500.00
- b) Casco Bank – United Students Aids Fund . . . 12,229.52
- c) Department of Health Education & Welfare Guaranteed Student Loan . . . . . . . . . . . . . . 5,235.20
- d) South Portland Municipal Credit Union Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,902.94
- e) State of Maine Dept. of Education Student Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,000.00
- f) University of Illinois-Nat'l Defense Stud. Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,324.58
- g) University of Pennsylvania – student loan . . 25,587.20

those debts. Only the State of Maine has objected to confirmation.

## II

Section 1325(a) of the Code requires the Bankruptcy Court to confirm a plan upon the satisfaction of certain conditions including whether the plan was proposed in good faith, § 1325(a)(3), and whether the "value on the effective date of the plan" of plan payments to unsecured creditors equals or exceeds the amount to be paid were the estate liquidated, § 1325(a)(4).

■ Turning first to the second of these tests, it would seem at first blush that a Chapter 13 plan providing for less than full payment on a student loan could never qualify. Section 523(a)(8) provides an exception from discharge of those student loans where the first payment became due within five years of the filing of the petition unless such exception would impose an undue hardship on the debtor and the debtor's dependents. Congress did not intend, however, for that section to apply to a discharge pursuant to § 1325(a) of the Code as the debtor seeks here. *In re Crawford,* 10 B.R. 815 (Bkrtcy.M.D.Ala.1981); *In re McBride,* 4 B.R. 389, 2 C.B.C.2d 302 (Bkrtcy. M.D.Ala.1980); *In re Keckler,* 3 B.R. 155, 6 B.C.D. 14 (Bkrtcy.N.D.Ohio 1980); *In re Thorson,* 6 B.R. 678, 6 B.C.D. 1268, 3 C.B. C.2d 66 (Bkrtcy.D.S.D.1980); *In re Seely,* 6 B.R. 309, 6 B.C.D. 1003, 2 C.B.C.2d 1128 (Bkrtcy.E.D.Va.1980); *In re Koerperich,* 5 B.R. 752, 6 B.C.D. 970, 2 C.B.C.2d 1284 (Bkrtcy.D.Neb.1980).[3] The best interest of creditors test of § 1325(a)(4) is thus to be construed, at least in this circumstance, as requiring only that Chapter 13 plan payments exceed the liquidation value of the debtor's property.

Such an interpretation is most consistent with the literal language of the section. It invokes a comparison between the value of plan payments as of the date of the plan and "the amount that would be paid on such claim if the estate were liquidated...." By the employment of such terms, Congress clearly indicated a desire to protect unsecured creditors from having to receive deferred payments having a present value less than the amount to be realized on liquidation. The test invokes no comparison between plan payments and the amount the creditor would receive on a non-dischargeable debt. Furthermore, to rule otherwise would frustrate the Congressional intent of providing for a broader discharge in Chapter 13 than in Chapter 7. The words of the statute are plain enough. They control. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 at 214, 96 S.Ct. 1375 at 1391, 47 L.Ed.2d 668 (1976). Moreover, in every case of statutory construction, "there is no canon against using common sense in construing laws in saying what they obviously mean." *In re Saypol,* 31 B.R. 796 at 802, 10 B.C.D. 1057 at 1060 (Bankr.S.D.N.Y.1983), quoting *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929). Here, it would make no sense to read the exception to discharge under § 523(a)(8) into the best interests of creditors test of § 1325(a)(4).

Here it is fairly clear that the liquidation value of the debtor's property is far less than the present value of the payments proposed in the debtor's plan. The issue of whether the plan should be confirmed, therefore, centers on the good faith requirement of § 1325(a)(3). The Code contains no definition of that term. "Good faith" was employed in § 366(4) of the former Bankruptcy Act. Consequently the courts, in defining that concept under the Code, have

---

**3.** Only debts noted in 11 U.S.C. §§ 1322(b)(5) and 523(a)(5) are excepted from discharge after payments have been completed under the plan. Those exceptions refer to curing of defaults and maintenance of payments of long-term loans during the life of the plan, and secondly, to payments incurred under alimony, maintenance, or child support agreements. *In re Tackaberry,* 13 B.R. 881 (Bkrtcy.D.Minn.1981).

It is settled that educational loans are not characterized by either exception to discharge. *In re Powell,* 29 B.R. 346, 8 C.B.C.2d 506 (Bkrtcy. D.Col.1983). Furthermore, the legislative history of § 1322(b)(5) specifically removes educational loans from this section. 5 *Collier on Bankruptcy* § 1328.01(1)(c)(1); *see In re Crawford,* 10 B.R. 815 (Bkrtcy.M.D.Ala.1981).

borrowed from prior cases construing the term in that context to mean,

"whether or not under the circumstances of the case there has been an abuse of provisions, purpose, or spirit of [the chapter] in the proposal."

*In re Terry,* 630 F.2d 634, 635 (8th Cir.1980) (quoting 9 *Collier on Bankruptcy* ¶ 9.20 at 319 (14th ed. 1978). *Accord Flygare v. Boulden,* 709 F.2d 1344, 8 C.B.C.2d 1027, 10 B.C.D. 1044 (10th Cir.1983); *In re Kitchens,* 702 F.2d 885 (11th Cir.1983); *In re Rimgale,* 669 F.2d 426 (7th Cir.1982); *In re Goeb,* 675 F.2d 1386 (9th Cir.1982); *Barnes v. Whelan,* 689 F.2d 193 (D.C.Cir.1982); *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir.1982).

In applying this standard, it is self-evident from the statute that the purpose of Chapter 13 is to afford individuals having a regular income and owing less than $100,000 to unsecured creditors, and less than $350,000 to secured creditors (§ 109(e)), with the opportunity to restructure those debts and thereby continue as productive members of society while retaining, if possible, the family home. *Cf.* § 1325(a)(5). This purpose is achieved through affording a discharge broader than that available under Chapter 7. The creditors are protected by application of the tests contained in § 1325(a).

From considerations akin to these, and after this Court's decision in *In re Scher,* 12 B.R. 258, 4 C.B.C.2d 784 (Bkrtcy.S.D.N.Y. 1981) upholding the validity of a zero payment plan, an eleven point non-exclusive list of relevant factors was formulated by the Eighth Circuit in *In re Estus,* 695 F.2d 311 (8th Cir.1982) and subsequently adopted by the Tenth Circuit in *Flygare v. Boulden, supra,* and the Eleventh Circuit in *In re Kitchens, supra.* In addition to the percentage of unsecured debts to be paid under the plan, those factors are:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.

*In re Estus, supra,* 695 F.2d at 317. At bottom these factors coalesce in an inquiry as to the reasonableness of the debtor's efforts to repay her debts. *In re Long,* 10 B.R. 880 (D.C.D.S.D.1981); *In re Schongalla,* 4 B.R. 360 (Bkrtcy.D.Md.1980); *In re Cook* 3 B.R. 480 (Bkrtcy.S.D.W.Va.1980). "Congress never intended, of course, that Chapter 13 serve as a haven for debtors who wish to receive a discharge of unsecured debts without making an honest effort to repay those debts." *Deans v. O'Connell, supra,* 692 F.2d at 972.[4]

---

**4.** In this district, a Chapter 13 debtor is required to disclose fully his assets, income and liabilities at the meeting convened under § 341 of the Code and to prepare a budget accurately reflecting the existence of surplus income that can be paid to creditors. Regular plan payments are required in the months preceding confirmation. Such payments demonstrate not only the feasibility of the plan prior to confirmation but also the debtor's good faith in avoiding liquidation. The presence of the debtor at the confirmation hearing is required so that creditors and the court can make inquiry of the particular stature of the debtor including his employment, whether he supports a family, the needs of his minor children, previous bank-

In exercising the informed discretion, *Deans v. O'Donnell, supra; cf. In re Kitchens, supra,* called for by such inquiry, the factors noted above assume varying degrees of importance depending on the facts of each case. Five circuit courts have now held that a set percentage of payment of unsecured debts is not required. The percentage offered serves, instead, to mark the depth of the initial inquiry. "Certainly, the greater the percentage payback offered in a plan, the stronger the presumption of good faith; while the lesser the percentage offered, the more intense the inquiry must be." *In re Heard,* 6 B.R. 876 at 879 (Bkrtcy.W.D.Ky.1980). As to other considerations bearing on good faith, it has been recognized that, standing alone, it is not bad faith to utilize the liberal discharge provisions of Chapter 13 rather than to file under the less desirable Chapter 7. *In re Seely,* 6 B.R. 309 (Bkrtcy.E.D.Va.1980); *In re Smith,* 8 B.R. 543 (Bkrtcy.D. Utah 1981). Similarly "a lack of good faith should not be inferred from an action of the debtor which is authorized by the plain meaning of the statute." *In re Lambert,* 10 B.R. 223, 226 (Bkrtcy.E.D.N.Y.1981); *see also In re Rowe,* 17 B.R. 870 (Bkrtcy.E.D.Va.1982).

█ Here, the debtor, in seeking to discharge student loans under Chapter 13, is seeking precisely the relief authorized by the statute. But it is the nature of these debts as student loans and the debtor's apparent ability to repay the loan by the State of Maine through service as a veterinarian in that State that give this Court pause.

Ordinary student loans, although structured as commercial transactions, reflect faith in the maxim that a recipient of higher education will be better able to function as a member of the community and to obtain employment enabling repayment of the loan. Through the Graduate Student Loan Program, loans are made to students by participating lenders, typically at low interest rates. Such loans are insured by the Department of Education, by a state, or by private non-profit guarantee agencies having reinsurance agreements with the Department of Education. If a student fails to pay back the loans because of death or disability, the lender may submit a claim and receive payment for the entire amount outstanding. Lender losses incurred by a student's default for other reasons or because of bankruptcy are treated differently. On these claims the federal government pays 100% of lender losses on Department of Education-insured loans and reimburses state or non-profit agencies for 80% of their payments to lenders. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 135, U.S.Code Cong. & Admin.News 1978, p. 5787 (1977).

Borrowers are expected to begin repayment 9 to 12 months after they cease to be at least half-time students. The repayment period normally extends from 5 to 10 years, with a minimum payment of $360 each year. *Id.* at 140. Repayment may be deferred for military, Peace Corps, or Vista service, or for resumption of full-time study. Also, if the student is seeking employment, but is unable to secure a job, a one-time, one-year payment deferment may be allowed. *Id.* at 140.

Lender losses due to bankruptcy, while of concern, apparently have not risen to such a level warranting special treatment for educational debts. *See* H.R.Rep. No. 595, 95th Cong. 1st Sess. 132–134, U.S.Code Cong. & Admin.News 1978, p. 5787 (1977). In fact, a study by the General Accounting Office in 1977 lends support to the argument that abuse of the fresh start policy of the Bankruptcy laws is not as widespread as was once feared. While the rate of educational loans discharged in bankruptcy has risen dramatically over the years, the rise does not appear to be disproportionate to the rise in the amount of loans becoming due. H.R. Rep. No. 595 at 133, U.S.Code Cong. & Admin.News 1978, p. 5787. A study by the Office of Education indicated a fairly consistent 5% of losses actually being incurred due to bankruptcy. H.R.Rep. No. 595 at 138, U.S.Code Cong. & Admin.News 1978, p. 5787.

ruptcy filings and the types of debt sought to be discharged, all in an effort to determine if,

indeed, the debtor has made the reasonable efforts required.

Nevertheless, the public policy served by the making of such loans requires further inquiry as to good faith than might otherwise be made. *See In re Estus, supra,* 695 F.2d at 317; *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979); *In re Kohn,* 5 B.C.D. 419 (Bankr.S.D.N.Y.1979); *Yarber v. Dept. of Health, Education and Welfare,* 19 B.R. 18 (Bkrtcy.S.D.Ohio 1982). Such further inquiry and scrutiny is especially appropriate where the loans serve not only the general public purpose of affording students with increased educational opportunities but also a specific state purpose. With respect to the loan by the State of Maine to Dr. Hawkins, the state purpose obviously is to encourage loan recipients to return to Maine upon completing their veterinarian studies and to provide such services to state residents.

What is particularly troublesome in this case is that confirmation of a plan such as Dr. Hawkins' would subvert this legitimate state interest when it appears that Dr. Hawkins is able to perform her obligations to Maine under the contract she signed. From her testimony, it appears that there are veterinarian jobs available in Maine but that few, if any, of these positions lie in Dr. Hawkins' specialty of small animal surgery. But this specialty, if indeed it is a specialty, was developed after she entered into her arrangement with the State of Maine and, it appears, would not limit her ability to function as a veterinarian for four years as that arrangement contemplates.

Moreover, Dr. Hawkins has no dependents or a husband in New York where she lives and desires to remain; her parents reside in Maine. This is not a case where a debtor is being asked to separate herself from her family in order to make a good faith effort to pay her debt.

Simply put, that Dr. Hawkins desires to remain in New York and to advance her career here rather than in Maine is not enough, in view of the public benefit sought to be achieved by the State of Maine in the program Dr. Hawkins entered. The four years that she could work in Maine would release her from that debt. The period is not unreasonably long, nor is Dr. Hawkins expected to work outside her general field or without pay. During that period, she might find that she can employ her specialized training and acquire additional training. In any event, her obligation would be completed and the State of Maine would have achieved the public purpose it sought to advance in enabling her to study at Penn.

Dr. Hawkins asserts that other indicia of good faith require confirmation of her plan. These consist of her sincerity in attempting to deal with her creditors prior to filing her Chapter 13 petition, a previous illness, and the absence of any misstatements or attempted preferential treatment of any creditor.

There can be no doubt that under the expert guidance of counsel Dr. Hawkins attempted to come to terms with her creditors and that their failure to respond led her to file her Chapter 13 petition. But that sincerity is tempered by her desire to avoid returning to Maine. She was ill for two weeks in 1981 but that previous illness does not, unlike the debtor in *In re Bellgraph,* 4 B.R. 421 (Bkrtcy.W.D.N.Y.1980), disable her from paying or infringe her ability to pay her creditors. Simultaneously, the absence of misstatements or attempted preferences in this case is not grounds for confirmation of a plan. The presence of candor and equal treatment of creditors are expected. The absence of such would indicate a need for closer inquiry.

This is a case where the debtor entered into an agreement to repay the amount of the loan or to fulfill a legitimate public purpose at about the same time she obtained a student loan from Penn that eventually exceeded $25,000. At the time, she could have only expected to return Maine rather than pay an additional $32,000. It is unreasonable to expect the obligation to be discharged absent compelling circumstances not presented here.

Furthermore, it appears that Dr. Hawkins has retained the option of returning to Maine. She therefore has a reasonable op-

portunity to release herself from her obligation without such circumstances. A plan hardly accords with the concept of good faith embodied in § 1325(a) where it proposes to discharge an obligation that is based in public policy and that the debtor has a reasonable opportunity to fulfill.

For the foregoing reasons, confirmation of the debtor's plan must be denied.

IT IS SO ORDERED.