**In re Natividad N. BEASLEY, Debtor.**

**In re Ernie D. HARRIS and Willie Ann Harris, a.k.a. Willie Ann Briggins, Debtors.**

**Bankruptcy Nos. 81B11391, 82B11339(HCB).**

United States Bankruptcy Court, S.D. New York.

Oct. 19, 1983.

Kenneth Silverman, of counsel, Horwitz & Associates, P.C., New York City, for debtors.

Jeffrey L. Sapir, Yonkers, N.Y., for Chapter 13 standing Trustee.

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Several creditors in each of these related Chapter 13 cases did not file proofs of claim. The debtors, Natividad Beasley and Ernie D. Harris and Willie Ann Harris, seek a ruling by this court that their payment obligations should be correspondingly reduced. In the alternative, they request modifications of their confirmed plans pursuant to 11 U.S.C. § 1329 to accomplish the same result.

## I

On July 14, 1981, Natividad Beasley filed a petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. (the "Code"). In mid-September, 1981, the debtor submitted a plan providing that she pay 36 monthly installments of $140 to the trustee. The plan contemplated 100% payment with 12% interest to the first and second mortgagees of the debtor's principal residence, payment of the trustee's statutory fee, and a $250 allowance to the debtor's attorney as an administrative expense, with the "balance to the unsecured creditors, representing 7% payout." The plan was confirmed without objection on September 23, 1981.

Beasley's schedules reflected a two-month arrearage on the payments due pursuant to the first mortgage, or a total of $886, and an 18-month arrearage under the second mortgage totalling $1,098. She also listed $16,059.05 in unsecured debt. The second mortgagee, however, did not file a proof of claim and has supplied the debtor with a satisfaction of mortgage. In addition, only $7,156.80 of the unsecured claims has been allowed. Since the plan required the debtor to pay a total of $5,040 over a 36-month period, a greater balance will be available for distribution to a smaller number of unsecured creditors than originally anticipated.

On July 21, 1982, Ernie D. Harris and Willie Ann Harris (a.k.a. Willie Ann Briggins) filed a Chapter 13 petition under the Code. A plan requiring the debtors to pay 36 monthly installments of $170 to the trustee was confirmed on November 24, 1982. The plan contemplated 100% payment with 12% interest of the mortgage arrearage on debtor's residence, payment of the trustee's statutory fee and $350 to the debtor's attorney, with the "balance to the unsecured creditors who file a proof of claim: 11% payout." As in *Beasley,* only a fraction of the unsecured creditors filed proofs of

claim, leaving a balance to be divided by a smaller number of unsecured creditors than originally anticipated.

In each case, the debtors intend to sell their residences, complete payments required by their plans, and obtain discharges pursuant to § 1328(a) of the Code.

The debtors in these related proceedings argue that the unsecured creditors are only entitled to the percentages of their claims designated in the plans—7% and 11% respectively. They contend that these percentages, rather than the amount of the monthly payments, control the distribution of the funds held by the trustee. On the other hand, the Chapter 13 Standing Trustee takes the position that the specific monthly payments required by the plans are the controlling figures. He therefore urges that all funds deposited must be distributed to the unsecured creditors who filed proofs of claim.

## II

Congress intended for Chapter 13 to provide a means for an individual to obtain a fresh start through making periodic payments to a trustee pursuant to a plan, with the trustee fairly distributing funds deposited to creditors. S.Rep. No. 989, 95th Cong., 2d Sess. 12 (1978). It represents an alternative to liquidation under Chapter 7, allowing a debtor to support himself and his dependents while simultaneously repaying his creditors. H.R.Rep. 595, 95th Cong. 2d Sess. 118 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787. Repayment plans accomplishing this dual purpose necessarily require debtors to retain funds reasonable and necessary to their support, while paying to the trustee amounts they can afford. In these proceedings, the debtors assert that their confirmed plans are controlled by arbitrary percentage allocations to unsecured creditors, rather than by the specific affordable amounts from which those percentages were calculated.

Nowhere, however, does the Code speak in terms of applicable percentages. Instead, § 1322(a)(1) of the Code, governing the contents of plans, speaks only of amounts it requires the debtor's plan to "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." Such funds are to be distributed to creditors "[e]xcept as otherwise provided in the plan or in the order confirming the plan." 11 U.S.C. § 1326(b).

In these proceedings, the debtors' plans provided for specific monthly payments to the trustee, designated secured creditors' claims, and recited that the balance was to go to unsecured creditors. Neither the plans nor the confirmation orders contained any statement that an unforeseen reduction in the number of creditors would correspondingly reduce the amount of payments required by debtors under their plans. The Code affords no separate basis for such relief. *In re S. Gray,* 28 B.R. 348 (Bkrtcy.S. D.N.Y.1983).

Moreover, such a plan provision would run contrary to the good faith standard of § 1325(a)(3). Under that section, the general scope of the inquiry is "whether or not under the circumstances of the case there has been an abuse of provisions, purpose, or spirit of [the chapter] in the proposal." *In re Terry,* 630 F.2d 634, 635 (8th Cir.1980) (quoting 9 Collier on Bankruptcy ¶ 9.20 at 319 (14th Ed.1978). *Accord Flygare v. Boulden,* 709 F.2d 1344, 10 B.C.D. 1044, 8 C.B.C.2d 1027 (10th Cir.1983); *In re Kitchens,* 702 F.2d 885, 8 C.B.C.2d 1022 (11th Cir.1983); *In re Rimgale,* 669 F.2d 426 (7th Cir.1982); *In re Goeb,* 675 F.2d 1386 (9th Cir.1982); *Barnes v. Whelan,* 689 F.2d 193 (D.C.Cir.1982); *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir.1982). Eleven factors have been identified as bearing on that issue. *In re Estus,* 695 F.2d 311, 317 (8th Cir.1982); *In re Hawkins,* 33 B.R. 908 (Bkrtcy.S.D.N.Y.1983).[1] The first four of those show that the income to be turned

---

**1.** The eleven factors identified by the *Estus* court are:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

over to the trustee is the debtor's surplus income, calculated on the basis of the debtor's employment history and earnings in comparison with his expenses over the life of the plan.

Arriving at a percentage which it is hoped will please the court is the antithesis of this process. So is the notion that when not all creditors file claims the debtor may increase his surplus income. If there remain creditors who are not to be paid in full under the plan, they should receive the increased dividend occasioned by the failure of others to file. To rule otherwise would impugn the process employed to calculate the debtor's surplus income and the good faith of the debtor in proposing the plan.

Absent any modification of the debtors' plans, the unsecured creditors are to receive a pro rata distribution of all funds currently held by or owing to the trustee.

## III

Perhaps, in anticipation of the impropriety of interpreting their plans in the manner they propose, the debtors contend that they should be permitted to modify their plans in order to limit payments to those unsecured creditors who filed claims. Section 1329 of the Code, in permitting a debtor to "increase or reduce the amount of payments on claims of a particular class provided for by the plan", however, limits that ability through reference to the provisions of § 1325(a) of the Code. Here, two requirements of § 1325(a) are most applicable. First, the plan as amended must have been proposed in good faith, and second, unsecured creditors must receive at least as much under the plan as they would receive in Chapter 7 liquidation. In these no asset or limited asset cases, it is clear that the unsecured creditors would receive a greater part of their claims under the modified plan than they would under Chapter 7 of the Code. But for the reasons directly related to the reasons noted above, the good faith of the debtors' proposed modifications gives us pause, particularly in the necessary implication that the good faith determination made on confirmation of their original plans may be suspect.

Proceeding chiefly on the ground of a desire to have additional surplus income attributable to the failure of some unsecured creditors to file proofs of claim, the debtors do not advance evidence that they need or require those additional sums rather than make payment to their creditors. Although Mrs. Beasley has retired, she is still receiving union benefits and Social Security, and will receive a profit of $15,000 less expenses from the sale of her house. Similarly, the Harrises will also receive a profit from the sale of their house. There has been no showing that they will not receive the customary salary increases accorded people in their position. No special circumstances such as inordinate medical expenses exist in either case.

In their original plans, the debtors allocated specific amounts for the payment of creditors, leaving themselves presumably adequate means for self-support. Modification of their plans, absent any meaningful change in their financial condition or some other reasonable excuse, is inconsistent with the prior determination of good faith, and should not be permitted. No such circum-

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;
(3) the probable or expected duration of the plan;
(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
(5) the extent of preferential treatment between classes of creditors;
(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;
(8) the existence of special circumstances such as inordinate medical expenses;
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
(11) the burden which the plan's administration would place upon the trustee.
*In re Estus*, 695 F.2d 311 at 317.

stance or excuse having been shown here, the motion to modify is denied.