**In re Tyrone WILKINSON and Linda Wilkinson, Debtors.**

**Bankruptcy No. 83–B–10560.**

United States Bankruptcy Court, S.D. New York.

Oct. 14, 1983.

Horwitz & Associates, P.C., New York City, for debtors; Kenneth Silverman, New York City, of counsel.

Philip Irwin Aaron, P.C., Jericho, N.Y., for The Richard Gill Co.; Stuart Paul Gelberg, Jericho, N.Y., of counsel.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The Richard Gill Company ("Gill") requests an order denying confirmation of the debtors' proposed plan and dismissal or conversion on the ground that the interest rate on mortgage arrearages is less than the interest rate provided for in the bond.

### Facts

As assignee from Mid-Island Equities of Hempstead, New York, Gill holds a bond, executed by the debtors on April 16, 1982, that is secured by a mortgage on the principal resident of Tyrone and Linda Wilkinson ("Debtors") known as 1352 Freley Avenue, Bronx, New York. The bond bears a 16.5% annual interest rate. Prior to April 15, 1983, the date which they filed their Chapter 13 petition, the Debtors made only four payments on the bond. As of April 15, 1983, eight mortgage installments remained unpaid. The Debtors' plan proposed to pay the mortgagee in full for all arrearages, including interest and fees, together with 12% interest over the life of the plan. Gill's proof of claim claims $7,578.40 in arrearages including interest at the bond rate of 16.5%. At the hearing on confirmation, the parties agreed to reconcile their disagreement over the amount of arrearages and fees. The issue to be decided here is whether the interest rate proposed in the plan conforms to the requirements of the Bankruptcy Code.

### Discussion

■ Section 1325(a) of the Code requires the Court to confirm a Chapter 13 plan if the conditions set forth therein are met. With respect to an allowed secured claim provided by the plan, § 1325(a)(5) mandates confirmation (a) if the secured creditor has accepted the plan, (b) if the property securing the claim is surrendered to the secured creditor, or (c) if

"(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim" 11 U.S.C. § 1325(a)(5)(B)

Here, Gill has not accepted the plan and the Debtors desire to retain their home. Nevertheless, the Court must "cramdown" a Chapter 13 plan on a secured creditor if these conditions are met. *Comment, Bankruptcy Reform Act of 1978: Chapter 13 Cramdown of the Secured Creditor,* 1981 Wisc.L.Rev. 333, 336.

There is no doubt that Gill is fully secured for the full amount of its claim. The value of the subject premises as stated in the Debtors' petition is listed at $60,000. The Gill claim, which includes the principal balance of $51,482.78 plus interest at 16.5% and other fees, totals $59,140.59. Since the claim is less than the value of the collateral, it is a fully secured claim pursuant to § 506(b) of the Code. *In re Simpkins,* 16 B.R. 956, 964, 6 C.B.C.2d 1081, 1090 (Bkrtcy. E.D.Tenn.1982); *In re Kauffunger,* 16 B.R. 666, 667 (Bkrtcy.D.N.J.1981).

Gill will retain its lien securing the claim. But the question remains as to whether the Debtors' plan provides to Gill the value of its collateral as of the effective date of the plan, as required by § 1325(a)(5)(B)(ii), or modifies Gill's rights in violation of § 1322(b)(2), which precludes a plan from modifying the rights of a mortgagee with respect to a mortgage on the Debtors' principal residence.[1]

▮ Turning first to the second of these issues, here it is clear that the plan does not entail a modification of Gill's rights: the principal is to be paid in full; the interest accrued at 16.5% is to be paid in full; and all fees are to be paid in full. All that is sought is that the Debtors be permitted to cure prior defaults over the life of the plan. As to that, the rule is that such a cure, even after acceleration, is not a modification of the mortgagee's rights in violation of § 1322(b)(2). *In re McSorley,* 24 B.R. 795, 798 (Bkrtcy.D.N.J.1982); *In re Roberts,* 20 B.R. 914, 919, 6 C.B.C.2d 892, 897 (Bkrtcy.E.D.N.Y.1982); *In re Simpkins,* 16 B.R. 956, 964, 6 C.B.C.2d 1081, 1089 (Bkrtcy.E.D.Tenn.1982). *In re Taddeo,* 685 F.2d 24, 27 (2d Cir.1982) held:

the power to cure any default granted in § 1322(b)(3) and (b)(5) is not limited by the bank against "modifying" home mortgages in § 1322(b)(2) because we do not read "curing defaults" under (b)(3) or "curing defaults and maintaining payments" under (b)(5) to be modifications of claims.

In other words, the test under § 1322(b) is whether the payments called for by the mortgage have been reduced. *See In re Taddeo,* 685 F.2d at 28. No reduction is contemplated here. The interest rate proposed in the plan is not in place of the contract rate. It is, rather, a rate to be paid on Gill's claim—a claim calculated on the basis of the contract rate. *See In re Webb,* 29 B.R. 280 (Bkrtcy.E.D.N.Y.1983).

But since the amount of the claim is to be paid over the five year life of the plan, § 1325(a)(5)(B) still requires that the "value of the secured creditor's claim, as of the effective date of the plan" be paid. Such value is present value determined by use of an appropriate interest rate. Present value is a market rate concept, *In re Webb, supra; In re Klein,* 10 B.R. 657 (Bkrtcy.E.D.N.Y. 1981), reflecting the cost to the creditor from not receiving the full amount of the

---

**1.** Section 1322, provides in pertinent part:
(b) Subject to subsections (a) and (c) of this section, the plan may—
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . .
(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

11 U.S.C. § 1322

claim on confirmation.[2] In determining market rate, a wide variety of approaches have been taken, including the rate of interest stated in the contract, *In re Smith,* 4 B.R. 12, 6 B.C.D. 424, 2 C.B.C.2d 77 (Bkrtcy. E.D.N.Y.1980), the rate of interest determined under § 6621 of the Internal Revenue Code, *In re Ziegler,* 6 B.R. 3, 6 B.C.D. 194 (Bkrtcy.S.D.Ohio 1980); *In re Busman,* 5 B.R. 332, 6 B.C.D. 683 (Bkrtcy.E.D.N.Y. 1980), the legal rate of interest, *In re Crockett,* 3 B.R. 365, 6 B.C.D. 226 (Bkrtcy.N.D.Ill. 1980), and the three month treasury bill rate with an upward adjustment of one-half of one percent, *In re Willis,* 6 B.R. 555, 6 B.C.D. 1101 (Bkrtcy.N.D.Ill.1980).

These methods, however, fail to reflect that the concept of present value expressed through an appropriate interest or discount rate reflects the cost of money. A secured creditor failing to receive the amount of its claim on confirmation can presumably borrow the sum elsewhere. Although some cases have found that there is a presumption that the discount rate and the contract rate are equivalent, *In re Smith, supra; In re Rogers,* 6 B.R. 472, 6 B.C.D. 1214, 3 C.B.C.2d 12 (Bkrtcy.S.D.Iowa 1980), those cases are not followed here because they fail to take into account the actual cost to the secured creditor of being temporarily deprived of payment of its claim. An unadjusted contract rate does not reflect the changes that have occurred in the market—a recognition necessary for an accurate computation of present value. Moreover, an unadjusted contract rate also contains elements of profit which are inappropriate in a Chapter 13 plan. *In re Klein, supra,* at 661; *In re Benford,* 14 B.R. 157,

161, 8 B.C.D. 117, 5 C.B.C.2d 79 (Bkrtcy.W. D.Ky.1981).[3]

These methods are also rejected because they fail to recognize the time value of receipt of money. Because sums received today can be invested, a delay in receipt requires a current interest rate reflecting the delay. Moreover, the interest rate utilized should reflect the length of the delay. Where the plan exceeds one year, use of the yield rate of fifty-two week treasury bills, *see In re Jewell,* 25 B.R. 44 (Bkrtcy.D.Kan. 1982); *In re Willis,* 6 B.R. 555, 6 B.C.D. 1101 (Bkrtcy.N.D.Ill.1980) is inappropriate.

Far more meaningful is the current market yield rate for United States Treasury Bonds and Notes for the life of the plan. Such rates bear a close relationship to the interest rates charged by banks on loans and reflect reinvestment opportunity. In the case at bar, the plan is of five years duration. An approximate interest rate could thus be determined not only by the yield available on such instruments five years from the date the petition was filed, but, to account for fluctuations, by an average of the yields six months before that date, and six months ahead. These yields, averaged together reflect the current market rate, and are easily ascertainable through mere examination of the financial pages of most large newspapers. They thus are an acceptable base upon which this Court can determine an appropriate rate. If, for example, a Chapter 13 plan were filed on September 30, 1983, the interest rate to be applied each month during the life of the plan to the balance of the secured claim then outstanding would be 11.28%.[4]

---

**2.** 'Present value' or the 'time value of money' is not a legal concept, but rather it is a term of art in the financial community. It simply means that a dollar received today is worth more than a dollar to be received in the future. To compensate the creditor for not receiving its money today, the debtor is charged an additional amount of money. The charge is based on a rate of interest called a "discount rate." The discount rate is used to calculate how much the creditor should be paid so it will have the same

amount of money in the future as it would have had if it did not have to wait to be paid. *In re Fisher,* 29 B.R. 542, 10 B.C.D. 858, 858–59 (Bkrtcy.D. Kansas 1983)

**3.** Moreover, the legislative history relied on in those cases is unrelated to § 1325(a)(5)(B)(ii). Comment, *See* Bankruptcy Reform Act of 1978, Chapter 13 Cramdown of the Secured Creditor, 1981 Wisc.L.Rev. 333, 351, n. 107.

**4.** This result is easily computed by averaging all the yields of the United States Treasury Bonds and Notes from February 1988 to April

In addition, an appropriate rate could reflect any material circumstances presented in the individual case relating to the costs to the secured creditor from the delay in receiving payment and to the probability that it will, in fact, be paid. Such circumstances could include the new stability of the debtor as shown by his having adopted a reasonable budget and having demonstrated the feasibility of the plan and his good faith in proposing it through making the regular payments required by this Court prior to confirmation. *See In re Hawkins,* 33 B.R. 908 (Bkrtcy.S.D.N.Y. 1983). Other circumstances might include proof of the actual rate paid by the mortgagee on loans from banking institutions and proof that the condition of the premises had significantly deteriorated or been improved since the making of the mortgage. No purpose is to be served by speculation as to other circumstances. But it would seem illogical, since the Court, in confirming a plan determined that it was feasible, to set an interest rate reflecting evidence that the plan will fail. If the plan is not feasible, it should not be confirmed.

No evidence of such circumstances has been presented here. The objection by the Richard Gill Company to the Debtors' Chapter 13 plan must be overruled and its motion denied.

It is SO ORDERED.

1989. The Treasury Bonds and Notes as listed in the New York Times, September 30, 1983, Section D, at 6, are as follows:

| Date | Yield | |
| --- | --- | --- |
| February 1988 | 11.10 | |
| April 1988 | 11.26 | |
| May 1988 | 11.07 | = 11.13% |
| May 1988 | 11.18 | |
| July 1988 | 11.35 | |
| August 1988 | 11.21 | |
| October 1988 | 11.42 | |

Since the September 1988 yield was not listed, the October 1988 yield is utilized. Then the average of the yields six months prior and six months after October, 1988 is 11.28%. When certain months have more than one yield listed, as with May and November, above, the averages of those multiple yields are to be comput-

ed for each month for use in computing the overall average.