**In re Martin & Tammy MITCHELL, Debtors.**

**Bankruptcy No. 87–00532S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 25, 1987.

David Searles, Philadelphia, Pa., for debtors.

James H. Gorbey, Jr., Media, Pa., for Frankford Trust Co.

Edward Sparkman, Philadelphia, Pa., Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

In the course of a previous Opinion of July 1, 1987, in the instant case, at 75 B.R. 593, 599 (Bankr.E.D.Pa.1987), and in another previous Opinion, *In re Crompton*, 73 B.R. 800, 807 (Bankr.E.D.Pa.1987), we posited that the discount or interest rate to be applied on claims on which payments were deferred in the respective Debtors' Chapter 13 Plans, to meet the requirement that a creditor receive the present value of its claim, per to 11 U.S.C. § 1325(a)(5)(B)(ii), should be established at a "market rate" of ten (10%) percent. We determined this rate, as of the May, 1987, date of the *Crompton* Opinion, by ascertaining the prevailing maximum interest rate established by the Pennsylvania Department of Banking for residential mortgages pursuant to 41 P.S. § 301(c), which is determined by a variable monthly rate measured by the Monthly Index of Long-Term United States Government Bond Yields, plus 2.5 percent.

Accepting the invitation of the Debtors in this case, we have carefully reconsidered our use of the rate established pursuant to 41 P.S. § 301(c) as the proper means of determining the appropriate interest rate to be applied to assure that a creditor receive the "present value" of its claim, per § 1325(a)(5)(B)(ii). We have now decided, for reasons explained hereinafter, that the best measure of the proper interest rate to be applied here is the rate of yield of Government Agency Issues maturing on approximately the date to which deferral of payments will extend, plus the addition of a one (1%) percent cost and risk factor. Ironically, this figure, given the increases in interest rates since May, 1987, works out to almost precisely the ten (10%) percent figure which we initially proposed here and in *Crompton*. We shall therefore set the interest rate on the deferred payments, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), at that figure here.

In *Crompton*, we engaged in little analysis of this issue. We merely cited to three decisions, *In re Paul*, 62 B.R. 269, 270–71 (Bankr.D.Neb.1986); *In re Mothershed*, 62 B.R. 113, 114 (Bankr.E.D.Ark.1986); and *In re Mitchell*, 39 B.R. 696, 700–02 (Bankr. D.Ore.1984), for the principle that we should use the "market rate" of interest to determine the correct rate to be utilized. The rate established pursuant to 41 P.S. § 301(c), being a legislatively-sanctioned measure which took variances in interest rates into account, seemed at that time to us to be the most handy tool to measure the "market rate." 73 B.R. at 807. In our previous *Mitchell* decision, we hypothecized the ten (10%) percent rate proposed in *Crompton* in determining the approximate amounts payable by the Debtors to formulate a feasible plan, without further analysis. 75 B.R. at 598–99.

On July 10, 1987, the Debtors filed a timely Motion requesting that we alter or amend our July 1, 1987, Opinion, as to our determination of the appropriate rate to be applied, per § 1325(a)(5)(B)(ii). This Motion was listed for a hearing before us on August 11, 1987, the date which we established, in the Order accompanying our July 1, 1987, Opinion, for a Confirmation Hearing on the Third Amended Plan which we allowed the Debtors to file, in accordance with the conclusions set forth in that Opinion.

On August 11, 1987, FRANKFORD TRUST COMPANY (hereinafter referred to as "Frankford"), appeared to argue Objections to the Debtors' Plan, most of which revolved around dispute of the Debtors' contention that the ten (10%) percent interest figure was too high. The Debtors had also sought certain discovery from Frankford relevant to Frankford's own costs of funds. We directed Frankford to answer this discovery as best it could; rescheduled the Confirmation on September 22, 1987, which was later continued to September 29, 1987; and invited the parties to file Briefs on the interest-rate issue on or before September 11, 1987 (Debtors), and September 18, 1987 (Frankford). We also denied the Debtors' motion to alter or amend our Opinion, pointing out that we had not firmly decided that the ten (10%) percent figure was appropriate in that Opinion, but had just hypothecized that figure to measure the potential feasibility of the Debtors' Plan.

In their Brief, the Debtors urged this court to adopt the following reasoning of Collier on this point appearing at 5 COLLIER ON BANKRUPTCY, ¶ 1325.06, at 1325–37 to 1325–38 (15th ed. 1987):

The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position economically as if the debtor exercised the option of surrendering the collateral. Through the payment of interest, the creditor is compensated for the delay in receiving the amount of the allowed secured claim, which would be received in full immediately upon confirmation if the collateral were liquidated. Since the creditor is deprived of these funds to the extent they are deferred through the plan, the creditor must obtain them elsewhere, for whatever purposes they were to be used. *In view of this purpose, the appropriate discount rate is one which approximates the creditor's cost of funds in its business*

*borrowing*. If the holder of an allowed secured claim receives interest which compensates it in full for any additional interest costs incurred due to the deferral of payment, it is not harmed by that deferral.

Thus, contrary to the holdings of a number of courts, it is rarely appropriate to select the rate charged to the debtor in the original transaction as the present value discount rate. Treating the chapter 13 deferral of payments like a new loan transaction, as those courts have done, provides the holder of the allowed secured claim with not only the cost of the funds it would lend but also the costs of a new loan transaction, which would not be incurred, and the profit that would be earned in that transaction. Neither of these latter two amounts would be received if the collateral were surrendered; the lender would have to incur new transaction costs to earn an additional profit. To include them in the present value discount rate would give the holder of an allowed secured claim more than the equivalent of immediate payment of that claim in full. Such a reading of the statute would also ignore the fact that, during the legislative process leading to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress specifically considered an amendment requiring the contract rate of interest to be paid and rejected it.

To determine the costs of funds to creditors and thereby the discount rate to be applied under section 1325(a)(5)(B)(ii), courts have usually looked to commercial credit market rates prevailing at the time of confirmation. *To make the process more simple and predictable, some have pegged their chapter 13 discount rates to the most recent rates for treasury bills, usually augmented by a small amount to compensate for the plan's risk of failure* (footnotes omitted) (emphasis added).

Interpreting Frankford's Answer to their discovery that Frankford's "break-even yield" at the end of July, 1987, was 7.12 percent established that 7.12 percent was Frankford's cost of funds, the Debtors suggested that we add a one (1%) percent risk factor and set the interest rate to be paid by the Debtors on the amounts on which payment was deferred under the Plan at 8.12 percent.

In its Brief, Frankford attacked the Debtors' reasoning as too simplistic. Frankford pointed out that the "break-even yield" failed to consider Frankford's cost of capital, cost of mortgage-loss provisions, and cost of maintaining reserves as required by the Federal Reserve Bank. Pointing out that most area mortgage rates were over ten (10%) percent at present and that even these figures did not include additional points charged to borrowers, Frankford contended that the ten (10%) percent rate was, if anything, too low.

A review of the current case law reveals that there is no consensus as to how the interest rate to be applied on payments deferred pursuant to a Chapter 13 Plan should be measured. Many of these cases and cases addressing the comparable issue which arises when priority tax claims are deferred pursuant to 11 U.S.C. § 1129(a)(9)(C), are collected in *Mitchell, supra*, 39 B.R. at 700–01. There, cases are noted which apply every interest rate from that set forth in the original contract between the parties, *In re Cooper*, 11 B.R. 391, 395 (Bankr. N.D.Ga.1981); and *In re Smith*, 4 B.R. 12, 13 (Bankr.E.D.N.Y.1980), to the legal rate of interest, *In re Johnston*, 44 B.R. 667, 670 (Bankr.W.D.Mo. 1984); *In re Coburn*, 36 B.R. 550, 551 (Bankr.W.D.Mo.1983); *In re Anderson*, 28 B.R. 628, 632 (Bankr.S.D.Ohio 1982); and *In re Crockett*, 3 B.R. 365, 368 (Bankr.N.D. Ill.1980). Other cases, purporting to use the "market rate," are also cited in *Mitchell* but the *Mitchell* court observes that the rate of interest established under 26 U.S.C. § 6621 of the Internal Revenue Code, the treasury bill rate, and the treasury bill rate with adjustments have been determined by various courts to constitute the "market rate."

Collier, as is noted above, rejects the extremes of the contract rate or the legal rate. The text states that the contract rate was expressly rejected by Congress as the

rate to be applied in deferrals of payments pursuant to § 1325(a)(5)(B)(ii). 5 COLLIER, *supra*, at 1325–38. We agree that use of the contract rate has no historical nor logical support, although we do believe that the contract rate should be a cap on what the lender may collect. Our reasoning for this holding is that a creditor should not be permitted to profit and increase its contract interest rate, to the detriment of the debtor and other creditors, because the debtor has filed bankruptcy. This observation may be relevant if interest rates should, contrary to the trend of the last several years, rise dramatically, as they did in the late 1970s and early 1980s, and have in the past several months.

On the other hand, we see no reason why the creditor should be forced to accept only the legal rate of interest. It is burdensome enough to the creditor to, in effect, force it to make a loan to the debtor for the deferral period. It thus appears unconscionable to us to require the creditor to accept no more than the legal rate of interest, which is clearly the rock-bottom rate payable, at least in Pennsylvania, where the legal rate remains six (6%) percent. *Compare Johnston* and *Coburn*, *supra* (Missouri legal rate of nine (9%) percent applied); *Anderson* (Ohio legal rate of eight (8%) percent applied); and *Crockett* (Illinois legal rate of nine (9%) percent applied).

We therefore conclude that, while the contract interest rate is not irrelevant, as it establishes the maximum rate collectible, it is appropriate to apply the "market rate" when the contract rate exceeds that "market rate" figure. Here, the contract rate is thirteen and three-quarters (13¾%) percent, far above what even the Mortgagee contends is the "market rate."

It is interesting to note that, in addressing 11 U.S.C. § 1129(a)(9)(C), Collier presents a somewhat different statement of the analysis to be utilized in ascertaining "present value" than that presented by the same text in the analysis of § 1325(a)(5)(B)(ii). There, at 4 COLLIER

ON BANKRUPTCY, ¶ 1129.03, at 1129–62 at 1129–63 (15th ed. 1987), the text states as follows:

It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the "market" interest rate (footnote omitted).

This quotation is followed by a footnote which extends for two pages and which recites the interest rates of various "markets," including prime rates, federal funds rates (which appears to be the same of the index used by 41 P.S. § 301(c), and designated therein as U.S. Government Agency Issues), Federal Reserve Bank discount rates, "call money" rates used by stock brokers, commercial paper rates, and rates for commercial paper and treasury bills of different denominations, as of three dates, May 22, 1979; August 11, 1980; and September 13, 1985. These rates vary from 7.22 percent for 13–week Treasury Bills on September 13, 1985,[1] to an 11¾% prime rate on May 22, 1979. This footnote illustrates that the term "market rate" is an illusory and practically meaningless concept unless a particular "market" is designated as a referrant.

Moreover, although the end result of each of the Collier quotes appears similar, i.e., a reference to some sort of government securities rate as a basis for determining "market rate," the emphasis is somewhat different. The passage relevant to § 1325(a)(5)(B)(ii) presents a debtor vantage-point, i.e., the creditor should get no more than the cost of his own money, plus perhaps a slight adjustment for risks, and no profit. Meanwhile, the passage relevant to § 1129(a)(9)(C) presents a creditor vantage-point, i.e., the creditor should get the

---

**1.** The 13–week Treasury Bill rate, as of September 22, 1987, was only 6.43 percent. See page 529 *infra*.

same in such an involuntary loan situation as it would in a voluntary loan situation.

The few appellate court-decisions addressing either of the two Code provisions in issue are not much help. In *United States v. Neal Pharmacal Co.*, 789 F.2d 1283 (8th Cir.1986), the Court of Appeals reversed a bankruptcy judge's sole reliance on the government's cost of borrowing "without reconsideration of the risk of nonpayment, the length of the payment period, and the existence of collateral." *Id.* at 1286. The bankruptcy court had proposed a floating interest rate, at the rate of yield of 13–week government Treasury Bills. The court was very critical of the use of a floating rate and remanded the case to consider the obviously-higher rate imposed by 26 U.S.C. § 6621 in the equation of determining a proper rate. *Id.* However, the Court of Appeals declined to state what it felt should be the appropriate rate or even the appropriate measure of the rate.

In *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983), another Court of Appeals rejected the use, by a bankruptcy judge, of a formula of the 26 U.S.C. § 6621 rate less one (1%) percent. The Court believed that the 26 U.S.C. § 6621 rate, while relevant, was too insensitive to market fluctuation and ignored "variations between the length of the pay out period, the quality of the security, and the risk of subsequent detail," *id.* at 652, to constitute the "market rate" *per se.*

In *In re Welco Industries, Inc.*, 60 B.R. 880 (9th Cir.Bankr.App.1986), the panel rejected the use, by the bankruptcy judges in the two cases considered, of the rate of yield for Treasury bills for the length of time of the respective debtors' pay-outs. The panel opined that use of this rate was erroneous because it failed to include a risk-factor. However, the panel also rejected the application of the 26 U.S.C. § 6621 rate, suggesting instead that "the prevailing market rate charged by commercial lenders taking into account the risk of default," *id.* at 883, should be used.

In *Memphis Bank & Trust v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982), the only Chapter 13 case at the appellate level, the Court rejected a bankruptcy judge's use of an "arbitrary ten percent rule," and suggested that "the most appropriate interest rate is the current market rate of interest used for similar loans in the region."

These decisions all have several things in common. They all reverse efforts by bankruptcy judges to render a pragmatic determination of the interest rates based on at least some semblance of an objective measurement. Further, they all decline to commit the courts issuing them to a superior alternative to that found wanting. Thus, they provide little practical help in determining which of the various potential "market rates" should be utilized as a basis in establishing the applicable interest rate.

We note a broad range of referrants utilized by bankruptcy courts to measure the "market rate" of interest. In *In re Paul*, 62 B.R. 269, 271 (Bankr.D.Neb.1986), the court, similar to what we did in *Crompton*, but not with the tool of the formula established in 41 P.S. § 301(c), utilizes a prevailing rate for fixed-rate mortgages. Numerous cases use Treasury bill yield rates, but even those differ in what duration of Treasury bill is utilized as a basis and the differences can be staggering, as we indicate below. The Treasury bill measures include the yield rate of 52–week bills, *In re Corliss*, 43 B.R. 176, 179 (Bankr.D.Ore.1984); and *Mitchell, supra*, 39 B.R. at 702; and the yield of bills for the length of the particular debtors' Plan. *In re Wilkinson*, 33 B.R. 933, 936 (Bankr.S.D. N.Y.1983). A slight variation on the foregoing is the approach of the court in *In re Fisher*, 29 B.R. 542, 549–50, 551 (Bankr.D. Kan.1983), which advocated use of the 52– week Treasury bill rate yield plus a one (1%) percent risk factor.

Two courts attempt to apply reasoning similar to that suggested in Collier's commentary on § 1325 set forth at pages 525– 526 *supra*. In *In re Campbell*, 16 B.R. 496, 497 (Bankr.N.D.Ill.1982), the court utilizes a figure of the 13–week Treasury bill yield rate plus one-half (½%) percent, which is the rate at which the particular creditor was said to be able to borrow money. The court in *In re Hardzog*, 74 B.R. 701, 703–04

(Bankr.W.D.Okla.1987), indicated an intention to use "the cost of funds approach," but merely schedules a hearing to determine this figure and therefore we are unsure how this figure will be determined by the court there.

Before embarking on our own final analysis, we note, from a practical vantage point, that the potentially-relevant interest rates, as of September 22, 1987, were as follows:

| | | |
|---|---|---|
| Prime Rate | | 8.75% |
| 13–week Treasury bills | | 6.43% |
| 52–week Treasury bills | | 7.08% |
| Treasury bills maturing in March, 1992 (date Debtors' Plan terminates) | approx. | 8.90% |
| Long-Term U.S. Govt. Bond Yields | | 8.97% |
| Rate per 41 P.S. § 301(c) (for October, 1987) | | 11.50% |

In theory, we believe that we could converge upon the optimal interest rate to be applied by ascertaining the mean between (1) the rate which borrowers standing in the shoes of the Debtors could obtain in the market less the profit realized by the lender, and (2) the cost of funds to Frankford plus the risk factor. The difficulty is determining how to ascertain any of the figures which should go into this equation, much less the mathematical solution. We probably conclude that 11.5 percent is the most that borrowers standing in the shoes of the Debtors would be likely to pay. We also might, with somewhat less certainty, conclude that the 7.12 percent figure constituting Frankford's "break-even yield" is the lowest estimate of the cost of its funds. But how can we do more than guess at the percentiles attributable to "profit realized" or the applicable "risk factor?"

The only firm conclusion at which we can arrive is that the Debtors' suggestion that utilization of the 41 P.S. § 301(c) rate, which we introduced in *Crompton*, was not well-advised is well-taken. That method of computation will yield a figure which is too high, as it will be the rate at which the Debtors would be likely to borrow *without* deducting the lender's profit. However, it also must be noted that, between May, 1987, and October, 1987, the interest-rate figure established by 41 P.S. § 301(c) increased by one and a half (1½%) percent.

After theorizing the means for computation of the optimal interest-rate figure and recognizing the impossibility of computing it because of lack of data, we are left with the task of formulating a workable solution here. Considering all of the foregoing authority, we consider the formulas proposed by the *Wilkinson* and the *Fisher* courts to come to the closest to accuracy. We believe that *Wilkinson* is correct in measuring the market rate at which the lender could obtain funds, i.e., the cost of funds, at the rate of yield for Treasury bills which most closely approximate the length of the Debtors' Plan. We believe that the *Fisher* court appropriately adjusts the applicable Treasury bill rate upwards by one (1%) percent to account for the risk factor, the failure to do which caused the *Welco Industries* court to find the same formula as that used in *Wilkinson* unacceptable.

We therefore formulate the following rule. We will establish the interest rate for deferred Plan payments under either § 1325(a)(5)(B)(ii) or § 1129(a)(9)(C) at the lesser of (1) the contract rate or (2) the rate of yield for Treasury bills due to mature on the date of the termination of the Debtors' Plan (rounded off to the nearest quarter percent) *unless* only interested parties are able to convince us that they can in fact establish the optimal interest rate as set forth at page 529 *supra*.

Here, neither party has convinced us that they have established or can establish the optimal interest rate. Therefore, we shall utilize the rate of yield for Treasury bills falling due in March, 1992, plus one (1%) percent. As we indicated at page 529, *supra*, the pertinent Treasury bill rate is 8.90 percent, which rounds off to nine (9%) percent to the nearest quarter. Adding the one (1%) percent risk factor results in computation of the rate figure as ten (10%) percent.

Thus, coming full circle, we conclude that the rate which we posited in our July 1, 1987, Opinion was accurate, although admittedly for the wrong reasons. With an

expression of appreciation to the submissions of both counsel, which were helpful to us, we enter the following Order, holding that the rate of interest which we shall require the Debtors' to pay on the amount deferred under any confirmed Plan shall be ten (10%) percent.