**In re Sharon OGLESBY a/k/a Sharon Cofey a/k/a Sharon Simmons a/k/a Sharon Council, Debtor.**

**Sharon OGLESBY, Plaintiff,**

v.

**ASSOCIATES NATIONAL MORTGAGE CO., Defendant.**

Bankruptcy No. 92–12736S.
Adv. No. 92–1003S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 11, 1993.

Mary Jeffery, Philadelphia, PA, for debtor.

Michael T. McKeever, Berwyn, PA, for Associates Nat. Mortg. Co.

Edward Sparkman, Philadelphia, PA, Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION

SHARON OGLESBY, a/k/a Sharon Cofey, Sharon Simmons, and Sharon Council ("the Debtor") has, once again, filed a Chapter 13 bankruptcy case to attempt to preserve 904 Longacre Boulevard, Yeadon,

Delaware County, Pennsylvania ("the Home"), as a residence for herself, eleven dependent children, and two dependent grandchildren. Although, in her past cases, the Debtor has unsuccessfully attempted to cure arrearages or to pay off the entire (then) agreed secured claim of her mortgagee, ASSOCIATES NATIONAL MORTGAGE CO. ("Associates"), of about $100,000, the Debtor has invoked 11 U.S.C. § 506 again, and seeks to pay off a secured claim of but $60,000, which, to her surprise, was the value fixed by an appraisal which both parties agreed could be admitted as the sole expert evidence of the Home's value.

Associates asserts several creative arguments to avoid the rather straightforward application of *Sapos v. Provident Institution of Savings in Boston*, 967 F.2d 918, 925–26 (3rd Cir.1992), to the determination of one matter before us, the above-captioned adversary proceeding ("the Proceeding"). We reject these arguments on their legal merit, although we agree that the frustration of Associates caused by the Debtor's inconsistency is justified and demands unusually strong protection of its interests.

We grant the Debtor the relief which she seeks in the Proceeding. As to the other matter before us, confirmation of a proposed amended plan of reorganization, we will allow the Debtor to file an amended plan consistent with this decision. However, we will require that any amended plan provide extraordinary protections for Associates, most notably that the Debtor remain current on her plan payments for at least 24 months after confirmation of the plan, or suffer a dismissal of this case which will include a prohibition from refiling for at least 180 days after the dismissal without express court permission.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed this case on May 4, 1992. It had been preceded by three prior cases filed under Chapter 13 of the Bankruptcy Code. In fact, its immediate predecessor, Bankr. No. 91–12199S, remained open as a converted Chapter 7 case in which a discharge had already been entered on the date that this case was filed. Moreover, the Debtor had earlier attempted to obtain reinstatement of the automatic stay in that case and reconversion of that case to Chapter 13, and abandoned those considerable efforts when her counsel realized that a new Chapter 13 filing was possible and would more easily serve the desired end of preventing an imminent foreclosure of the Home. These cases were preceded by two Chapter 13 cases in which the Debtor was represented by Delaware County Legal Assistance Associates, Inc. ("DCLA"), one of which was heavily litigated. The plans in these cases proposed to cure arrearages. Both of these cases were dismissed when required payments became delinquent.

Associates expressed its dissatisfaction with the Debtor's present effort at its outset by filing a motion to dismiss this case just eight days after its filing on May 12, 1992. The result of the motion was an Order of May 29, 1992, captioned in both this case and Bankr. No. 91–12199S, in which we allowed this case to proceed on the condition that the Debtor pay the Trustee (or, as later amended, Associates directly) at least $2,192 monthly, beginning in June, 1992. At the time, the Debtor valued the Home at $100,000, and the payments were believed to be what was required to make full payment of the value of the Home to Associates over the maximum five-year length of the contemplated plan. The $100,000 value figure was consistent with estimates expressed in the Debtor's predecessor bankruptcy cases. Associates' entire secured claim was estimated to be over $113,000.

On September 22, 1992, the Debtor filed the instant adversary proceeding under 11 U.S.C. § 506, which had been contemplated as necessary to effect even a plan consistent with the May 29, 1992, Order. The Complaint averred that the fair market value of the Home had now fallen to $85,000. Associates answered the Complaint with two words: "Admitted" as to the first four paragraphs (asserting jurisdiction and identifying the parties) and "Denied" as to all

the rest. No affirmative defenses were pleaded.

Trial of the Proceeding was originally scheduled on November 10, 1992. Meanwhile, a hearing to consider confirmation of the Debtor's Chapter 13 plan was initially scheduled on October 13, 1992. The confirmation hearing was continued until the November 10, 1992, trial date of the Proceeding. Both were continued by agreement of the parties until December 10, 1992, and again until January 5, 1993. This court directed that there be no further continuances of the trial of the Proceeding beyond January 5, 1993.

On the latter date, the parties agreed to try the Proceeding and the confirmation issues together, and presented a substantial Stipulation of Facts, with exhibits. Among the exhibits was an appraisal of the Home, as of November 16, 1992, at a value of but $60,000. The appraiser was Robert Ludwig ("Ludwig"), well-known as an even-handed expert frequently employed by debtors and creditors alike to value Delaware County real estate. *See In re Cobb*, 122 B.R. 22, 24–25 (Bankr.E.D.Pa.1990).

The Stipulation recited that the Debtor obtained the Home by assuming a mortgage obligation to Associates entered into by one Larry D. Cook ("Cook") on March 1, 1985. Ultimately, apparently in late 1987, Associates obtained a mortgage foreclosure judgment in the amount of $81,-479.09 against the Debtor. It was also stated that the Debtor's DCLA attorney, Roger Ashodian, Esquire, would have testified, if called, that the Debtor's financial circumstances from 1988 to 1990 caused him to recommend "cure plans" rather than "pay-off plans." The mortgage of March 1, 1985, as well as Ludwig's appraisal, was attached to the Stipulation.

There was also supplemental testimony from the Debtor. Therein, she recited her various sources of income, including wages and commissions as a representative/salesperson of a group health plan; support from two ex-husbands who are fathers of some of her children; social security benefits for two disabled children; and lease and rental payments from certain other real estate owned by her in the City of Philadelphia. She also recited large food, utility, and incidental expenditures for her 14–member family; certain payments to maintain taxes and repairs on some of the Philadelphia properties; and a proposed monthly payment of $1,107 to Associates, consistent with the "new" reduced $60,000 valuation of the Home.

When asked to explain her present advocacy of the $60,000 valuation of Ludwig despite her own prior consistent valuations of the Home in the neighborhood of $100,-000, the Debtor stated that she had simply been mistaken. She attributed the point of difference to her prior belief that conversion of the basement of the Home into a three-bedroom dormitory for several of her children, at significant cost to her, had greatly enhanced the value of the Home. Ludwig, she reported, had convinced her that these improvements had little, if any, positive impact on the Home's valuation.

Another area of questioning by Associates was the delinquent status of the $2,192 monthly payments which she was so confident of her ability to make in May, 1992. The Debtor now conceded that she was at least one and a half payments in arrears through December, 1992, and that no January, 1993, payment had yet been made. Associates alleged that she was four payments in default.

After the completion of the consolidated adversary trial and confirmation hearing of January 5, 1993, this court entered an Order memorializing the parties' agreement to submit Opening Briefs by January 19, 1993, and Reply Briefs by January 26, 1993. Associates accompanied the filing of its opening and only Brief with a certification of the Debtor's defaults in making half of the payments due between June, 1992, and January, 1993, under the Order of May 29, 1992, alleging that a default of an even greater sum than had been alleged at trial was justified because of its recent discovery that three checks totalling $3,288.00 had just been returned for insufficient funds.

The Debtor responded with her only brief, and also contested the Certification

of Default with a motion of January 27, 1993, seeking relief from the terms of the May 29, 1992, Order on the ground that the Order assumed what had been learned to be an inflated valuation of the Home. A hearing was scheduled on this Motion and Objections to the Certification of Default on February 16, 1993, but our accompanying Order disposes of these matters.

## C. DISCUSSION

### 1. THE INSTANT MORTGAGE IS NOT WITHIN THE SCOPE OF 11 U.S.C. § 1322(b)(2) AND THE PROSCRIPTIVE POWER OF THE PERRY DECISION.

As was alluded to below, Associates offers several arguments as to why the reasoning of *Sapos* should not be applied in this case. The first is that the foreclosure judgment which Associates obtained against the Debtor in 1987 was strictly an *"in rem* proceeding" which left it with a claim secured only by the Home, and hence squarely within the scope of 11 U.S.C. § 1322(b)(2). This conclusion is supported by the assertion that the Debtor was only Cook's assignee, and hence was not, in any event, personally liable on the mortgage.

These arguments were not pleaded by Associates. Nor is there any support for assumptions about the relationship of Cook, the Debtor, and Associates in the record. Throughout all of the prior cases, Associates clearly looked to the Debtor as if she were its "true" mortgagor.

■ However, putting aside Associates' failure to plead these defenses, we note that this court has expressly held that a mortgage foreclosure action is not strictly an *"in rem* proceeding." *In re Dangler*, 75 B.R. 931, 935–36 (Bankr.E.D.Pa.1987). Moreover, even if the foreclosure proceeding were *in rem*, the scope of the judgment would not diminish the scope of the security interest taken against the mortgage holder by Associates in the mortgage. *See In re Caster*, 77 B.R. 8, 11–12 (Bankr. E.D.Pa.1987) (language in mortgage giving the mortgagee a right to enforce a security interest against a mortgagor's personal property in addition to the mortgaged real

estate in itself creates a security interest sufficient to take the mortgage out of the scope of 11 U.S.C. § 1322(b)(2)). Finally, the fact that the Debtor is only Cook's assignee rather than the original mortgagor is irrelevant, because, in an assignment, the assignor's whole interest is taken by the assignee, subject to all of the rights and responsibilities previously lying in the assignor. *See, e.g., Brager v. Blum*, 49 B.R. 626, 629 (E.D.Pa.1985); *In re Lease–A–Fleet, Inc.*, 141 B.R. 853, 861–62 (Bankr. E.D.Pa.1992); and 6 AM.JUR.2d 185 (1963).

Therefore, we conclude that none of the initial bases articulated by Associates for distinguishing this case from *Sapos* have merit.

Associates next attempts to invoke *First Nat'l Fidelity Corp. v. Perry*, 945 F.2d 61 (3rd Cir.1991), in its favor in two ways. Firstly, it argues that the conclusion that 11 U.S.C. § 1322(b)(2) applies to the instant mortgage transaction precludes the Debtor from stretching out her alleged state-law obligation to immediately pay off the foreclosure judgment over the life of her plan. Secondly, Associates argues that, since Act No. 6 of 1974, 41 P.S. § 101, *et seq.* ("Act 6"), the Pennsylvania state law which provides mortgagors with a right to cure defaults in certain "residential mortgage" obligations, 41 P.S. § 403(a), does not apply to mortgages with principals exceeding $50,000, *see* 41 P.S. § 101 (definition of "Residential mortgage"), and the principal amount of the mortgage was originally $58,000, Act 6 does not apply. Therefore, it argues, the law of Pennsylvania applicable to the instant mortgage is indistinguishable from the applicable law of New Jersey, which *Perry* holds precludes the liquidation of a mortgage in a Chapter 13 plan subsequent to a foreclosure judgment.

The first response to these arguments is that Associates does not appear to have correctly concluded that § 1322(b)(2) applies to the instant transaction. We have already concluded, at page 624 *supra*, that neither the nature of the Debtor's interest in the Home nor the nature of Associates' foreclosure judgment mandates the applica-

tion of § 1322(b)(2) to the instant transaction. Moreover, a careful review of the mortgage reveals that Associates has taken a security interest in the mortgagor's oven, dishwasher, and fan vent, as well as "rents, issues, and profits" from the Home. The Debtor, as noted at page 624 *supra*, stands in the shoes of Cook and is therefore subject to these security interests as well.

■ Since Associates' interest in the Home is therefore not secured *only* by a security interest in the Debtor's residence, but by certain personalty owned by the Debtor as well, § 1322(b)(2) clearly does *not* apply to the instant factual setting. *See Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123, 128–29 (3rd Cir.1990); and *In re Taras*, 136 B.R. 941, 950–51 (Bankr.E.D.Pa.1992). By way of contrast, the *Perry* court expressly declined to consider whether the mortgage in issue there was within the scope of § 1322(b)(2) because the debtor failed to preserve that issue for appeal. 945 F.2d at 62 n. 1.

Secondly, we question whether the mortgage in issue could not be interpreted to include a right to cure under applicable Pennsylvania law. The applicable Pennsylvania law is, at worst, ambiguous. We know that Pennsylvania law expressly establishes a right to cure as to mortgages the principal amount of which is less than $50,000. We also know that Pennsylvania law consistently protects homeowners, in all economic strata, in preserving the retention of their residences. *See Taras, supra*, 136 B.R. at 951–52; and *In re Fox*, 83 B.R. 290, 298 (Bankr.E.D.Pa.1988). It would seem most curious to conclude that the strong Pennsylvania policy allowing a right to cure mortgage arrears would be completely eliminated in the instance of a mortgage the principal of which is only a few thousand dollars in excess of $50,000. This is particularly so when the factor of inflation in the value of homes and the concomitant rise in the amount of home mortgage principal balances in the 19 years since the enactment of Act 6 is considered.

Finally, as we recently observed in *In re Shields*, 148 B.R. 783, 789 n. 2 (Bankr.

E.D.Pa.1993), the *Perry* debtor failed to invoke 11 U.S.C. § 1322(b)(3). The instant Debtor may, however, invoke that Code section in support of a plan seeking to cure a default in a mortgage obligation. *See In re Roach*, 824 F.2d 1370, 1374–77 (3rd Cir. 1987); *Taras, supra*, 136 B.R. at 951 n. 5; and *In re Ford*, 84 B.R. 40, 43–44 (Bankr. E.D.Pa.1988).

■ We do believe that Associates is correct in its assertion that it is technically inappropriate to refer to a "bifurcation" of its mortgage into secured and unsecured portions in the instant factual matrix. However, the reason for this is not because of the limited nature of Associates' claim and judgment against the Debtor, but because the unsecured portion of Associates' claim has already been discharged in the Debtor's preceding Chapter 7 case, as in *Taras, supra*, 136 B.R. at 946 n. 1.

We therefore conclude that the Debtor may properly use § 506 to measure the allowed secured claim of Associates in the interest of the Debtor's estate in the Home, unhampered by the presence of § 1322(b)(2) or the conclusions reached by the court in *Perry*.

2. THE SECURED CLAIM OF ASSOCIATES IS PROPERLY FIXED AT $60,000.

■ Associates suggests that the Debtor should not be permitted to utilize the $60,-000 value figure placed upon the Home by Ludwig's appraisal, even though the accuracy of this appraisal is undisputed by it, because the Debtor herself, at the outset of this case and in the course of her prior cases, valued the Home much higher. Presumably, Associates' argument is based upon the notion that the Debtor should be estopped to deny her previous, inflated self-declared values of the Home.

In certain contexts, this court has emphasized the importance of a debtor's valuing property accurately in Schedules. Therefore, we have been reluctant to let debtors abuse this self-declaratory honor-system by offering a valuation skewed, usually low, to convince creditors that all of a debtor's

property should be exempt, which is then quickly "forgotten" when the scheduled property is damaged or lost and a much higher figure of compensation for same is sought from a third party. *See Payne v. Wood,* 775 F.2d 202, 204–07 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); and *In re B. Cohen & Sons Caterers, Inc.,* 97 B.R. 808, 817 (Bankr.E.D.Pa.1989), *aff'd in part & remanded in part,* 108 B.R. 482 (E.D.Pa. 1989), *appeal dismissed,* 908 F.2d 961 (3rd Cir.1990), *clarified on remand,* 1990 WL 2632 (Bankr.E.D.Pa. Jan. 11, 1990), *aff'd,* 124 B.R. 642 (E.D.Pa.1991), *aff'd,* 944 F.2d 896 (3rd Cir.1991).

However, there is a major distinction between the facts of *Payne* and *B. Cohen* on one hand, and this case on the other hand. In those cases, the respective debtors attempted to repudiate value estimates which were obviously intended to benefit them in other ways. Here, it is difficult to conceive of any ulterior motive which the Debtor may have had for over-estimating the value of the Home in the course of this and her prior cases. Concomitantly, it is difficult to envision any manner in which Associates or any other party could have relied upon the Debtor's previous declarations of value to their detriment. The silence of Associates in the face of Ludwig's appraisal suggests that it knew all along that the Debtor was inflicting additional obligations upon herself by over-valuing the Home.

■ Justified reliance upon the action of a party against whom estoppel is asserted is a necessary ingredient for invocation of estoppel. *See In re Webb,* 99 B.R. 283, 290 (Bankr.E.D.Pa.1989). No reliance to its detriment upon the Debtor's higher estimates has been alleged, much less has been proven, by Associates. Therefore, estoppel cannot be applied in favor of Associates and against the Debtor here as to the issue of valuation of the Home.

Hence, in making the valuation necessary for a § 506 determination, we will utilize the $60,000 figure appearing in Ludwig's appraisal.

### 3. THE DEFERRAL INTEREST RATE OF NINE (9%) PERCENT CHOSEN BY THE DEBTOR APPEARS APPROPRIATE.

■ Associates also contests the propriety of a nine (9%) percent deferred interest rate which the Debtor proposes to utilize to provide it with the full value of its allowed secured claim in her plan, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii). Associates' sole dispute with this figure appears to be that the Debtor's past delinquencies justify an enhanced "risk factor" in the establishment of this figure.

The case in which we most thoroughly analyzed the issue of an appropriate deferred interest rate to be applied under § 1325(a)(5)(B)(ii) is *In re Mitchell,* 77 B.R. 524 (Bankr.E.D.Pa.1987). In that case, we established that, unless evidence were presented to the contrary, a bankruptcy court should apply the lower of the mortgage contract rate or the market rate of interest. *Id.* at 529. The market rate was measured by the rate of yield of United States Treasury bills which most closely approximated the length of the debtors' plan, plus a one (1%) percent risk factor. As of the date of the *Mitchell* decision (May, 1987), at which time home mortgage interest rates generally exceeded, by a substantial margin, current comparable rates, we accepted the debtors' proffered deferral interest rate figure of ten (10%) percent.

The above-referenced decision was a sequel to a decision reported as *In re Mitchell,* 75 B.R. 593, 599 (Bankr.E.D.Pa.1987) (*"Mitchell I"*). In *Mitchell I,* we characterized the payment record of the Debtors—parents of three children who had made but three payments on their mortgage in its lifespan of about three-and-a-half years, *id.* at 600, 597, 599—as "abysmal." *Id.* at 599. While we conditioned the denial of the mortgagee's motion for relief from the automatic stay on the Debtors' maintenance of the requisite future performance, *id.* at 600–01, we did not enhance the "risk factor" in the established deferral interest rate in light of these facts.

Following *Mitchell,* we are not inclined to work the interest rate by adding a risk

factor in light of the Debtor's past poor payment record, which is, incidentally, much better than that of the *Mitchell* debtors. Rather, as in *Mitchell,* we will deal with the Debtor's past unreliable financial performances by conditioning the Debtor's future presence in Chapter 13 on continued full performance. *See* page 628 *infra.*

The contract rate set forth in the mortgage is twelve and a half (12½%) percent. Home mortgage interest rates are currently around seven (7%) percent, and the applicable Treasury bill rate is about six (6%) percent. Under these circumstances, a nine (9%) percent rate seems not only acceptable, but generous to Associates.

4. THE DEBTOR'S PLAN IS FEASIBLE, ESPECIALLY IF IT IS REQUIRED TO INCLUDE PROVISIONS WHICH WILL REQUIRE FUTURE PERFORMANCE OR RESULT IN DISMISSAL OF THIS CASE WITH PREJUDICE.

█ The principle objection raised by Associates to confirmation of a Chapter 13 Plan proposed by this Debtor, be it her present plan, which contemplates payment of its allowed secured claim directly to it over 60 months, or any more finely-tuned amended plan continuing similar features, is that the Debtor will prove to be unsuccessful in fulfilling her commitments. In essence, this is an objection to plan feasibility, set forth as follows in 11 U.S.C. § 1325(a)(6):

§ 1325. **Confirmation of plan.**

(a) Except a provided in subsection (b), the court shall confirm a plan if—

.    .'    .    .    .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

Associates analyzes the Debtor's income and expenditures, and concludes that the former exceed the latter by about $800 monthly. Associates contends that, even when the new proposed monthly payment to it of "only" $1,107.78, in lieu of a mortgage payment, is factored in with real estate taxes, insurance, and water and sewer charges relevant to the Home, shelter costs comprise forty (40%) percent of the Debtor's expenditures. Associates argues that such expensive shelter investments are "burdensome" to the Debtor's estate.

The Debtor warmly disputes Associates' calculations. She specifically contests Associates' understatement of her income through omission of her $500 estimated monthly commissions, over and above her fixed salary. Other areas of dispute are Associates' additions of the following monthly payments: (1) tax payments of $480 towards two of her Philadelphia properties; and (2) student loan payments of $500. The Debtor contends that she need not pay any payments towards the Philadelphia properties, but can make any necessary payments (or, presumably, no payments, if possible) outside of her plan. *See In re Waldman,* 75 B.R. 1005, 1007–08 (Bankr.E.D.Pa.1987); and *In re Evans,* 66 B.R. 506, 509 (Bankr.E.D.Pa.1986), *aff'd,* 77 B.R. 457 (E.D.Pa.1987). The Debtor testified that she expects to obtain a deferment of her school loan payments, and this appears likely to us in light of the Debtor's relevant testimony.

Adjustments for these differences change the Debtor's monthly deficits of almost $800 into a "cushion" of about $680/month. The Debtor is therefore convincing in establishing that her monthly ledger-sheet is not necessarily negative. Also, with these revisions, the Debtor's shelter costs comprise only about one-third of her income. In any event, Associates offers no analysis of how and where 14 people could live more cheaply than in the Home. Indeed, the Debtor, we think accurately, claims that the Home is her most priceless commodity. It is difficult to believe that Associates was serious, from a human perspective, in suggesting that retention of the Home was a burden to the Debtor.

Of somewhat more practical substance is, however, Associates' observation that past, supposedly well-laid plans of the Debtor have uniformly gone astray, doubtless due to the almost incalculable number of contingencies that can arise to frustrate

the intentions of the head of a family containing 13 dependents.

The leading decision of this court on the subject of Chapter 13 plan feasibility, in this context, is *In re Capodanno*, 94 B.R. 62, 64–66 (Bankr.E.D.Pa.1988). Declining to view the plan in that case of a nine-member (seven children) family whose principal wage earner's main source of income was irregular construction work as infeasible, we held as follows, *id.* at 65:

Our own decisions have acknowledged the economic resiliency of low-income persons, who are often accustomed, by necessity, to get by on financial arrangements which persons blessed with higher incomes find inconceivable. *See In re Crompton*, 73 B.R. 800, 809 (Bankr. E.D.Pa.1987) (in considering financial prospects of unmarried female debtor with two young children, this court refuses to set down a rule that a "cushion" is always a prerequisite). We fail to see where we are doing any favors to persons in dire financial straits by declining to give them a chance to preserve their homes, thereby pushing them closer to or into the growing ranks of the homeless. Therefore, we are inclined to give debtors a chance, even when their post-payment performances have been "abysmal," as long as their plan "does not seem to us to be out of reach." *In re Mitchell*, 75 B.R. 593, 599–600 (Bankr. E.D.Pa.1987). If they fail to maintain their payments under the Plan, the Standing Chapter 13 Trustee, as well as any interested party, may move for dismissal or conversion of the case to Chapter 7. 11 U.S.C. § 1307(c)(6).

In *Capodanno*, we did proceed to confirm the Debtors' plan, but only upon the conditions that the Debtors agree to amend their plan to obtain a wage attachment on the husband's pay and to require them to liquidate a family boat, retention of which we perceived as an unjustified luxury. *Id.* at 66.

We believe that the appropriate response to the feasibility issue here should be similar. The Debtor's resources exceed those of the *Capodanno* debtors. However, the number of dependents also exceeds that of even the prolific Capodanno's. Also, very notably, the filing before us was the *Capodanno* debtors' first, not their fourth.

Confirmation here will therefore be conditioned on the Debtor's prompt submission of an amended plan containing the following provisions:

1. A clear statement of the Debtor's precise proposed payments to Associates.

2. Provisions assuring that real estate taxes, insurance, and water and sewer billings against the Home will be paid.

3. A clear statement of other obligations to be paid inside and/or outside of the plan.

4. An agreement to make all payments promptly, reinforced by a provision allowing Associates to certify to this court any default of a plan provision during the first twenty-four (24) months of the plan, after twenty (20) days' notice and right to cure to the Debtor and her counsel.

5. An agreement that, upon the Debtor's failure to contest an allegation of, and/or the entry of a court order confirming, a material default in the Debtor's plan performance, this case will be dismissed, and no other bankruptcy case may be filed by the Debtor within 180 days of the entry of the order of dismissal, except by express permission of the court upon motion after notice of its filing to Associates.

In this way, both Associates and the court will be protected from yet another Chapter 13 plan failure and will break the pattern of sequential filings by the Debtor. With these provisions, and only with these provisions, intact do we deem Associates' interest adequately protected by a proposed amended plan.

An Order consistent with these directives (and incidentally disposing of the Motion for relief from our Order of May 29, 1992, which would be, in any event, pre-empted by a confirmed Plan), will be entered.