In re Cheryl SMITH, Debtor.

Bankruptcy No. 94–12458DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 2, 1995.

438

Stacey L. Smith, Levittown, PA, Kevin T. Keane, Luxembourg Corporate Center, Langhorne, PA, for debtor.

Jeffrey C. McCullough, Doylestown, PA, for Dorothy Luff.

Joshua Z. Goldblum, Feasterville, PA, for Russell Smith.

Peter Delaney, Langhorne, PA, for GM Group.

Edward Sparkman, Standing Chapter 13 Trustee, Philadelphia, PA.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

## A. INTRODUCTION

The instant Chapter 13 bankruptcy case presents Objections to certain of the Debtor's exemptions claimed in her original Schedules and to confirmation of her Amended Chapter 13 Plan ("the Plan"). We find that all of the Objections ultimately pressed by the remaining objectors were filed out of time pursuant to the strictly-enforced time deadlines in the national Rules for objecting to claimed exemptions and a local Rule relating to objections to confirmation, and therefore must be deemed waived. In addition, we find that the Objections to confirmation lack merit and that the claimed exemptions appear to have merit. Consequently, the Plan will be confirmed.

## B. PROCEDURAL AND FACTUAL HISTORY

CHERYL SMITH ("the Debtor") filed the underlying Chapter 13 bankruptcy case on April 22, 1994. On May 2, 1994, Kevin T. Keane, then her counsel, filed Schedules and a Chapter 13 Plan ("the 1st Plan") on the Debtor's behalf. Claimed as exempt on Schedule C, on the basis of a generalized invocation of "11 U.S.C. § 522(d)," were entries described as $7,500 in realty valued at $179,000 located at 28 Lydia Avenue, Churchville, Pennsylvania ("the Home"), and the entire $30,000 value of an "Annuity" [sic]. The 1st Plan provided that $375 monthly was to be paid to the Trustee; that future payments to secured creditors were to be paid directly and arrears were to be paid by the Trustee from the Plan payments; and that the Trustee was "to pay all unsecured claims under the Plan."

By notice sent on May 23, 1994, to all creditors listed on the mailing matrix by Keane, the meeting of creditors was scheduled on June 13, 1994, and the confirmation hearing was set for September 27, 1994. On August 2, 1994, however, Keane was disbarred by consent by order of the District Court. A request from this court for Keane to comply with Pennsylvania Rules of Disciplinary Enforcement 217(b), (c), requiring a

**440**

formerly admitted attorney to advise clients of a substitute attorney or to move to withdraw, was met with a reply that substitute counsel was unknown, and then total inaccessibility. No substitute counsel was apparently actually named.

Meanwhile, the confirmation hearing was continued to, ultimately, October 27, 1994, prior to which, on October 3, 1994, Edward Sparkman, Esquire, the Standing Chapter 13 Trustee ("the Trustee"), filed a motion to dismiss the case because payments were in arrears. Then, on September 30, 1994, Dorothy Luff, ultimately identified as the record owner of the Home, subject to a real estate installment sales contract of August 8, 1991 ("the REISC"), to sell the Home for $100,000 to her son, Russell Smith ("Russell"), and his (estranged) wife, the Debtor, filed a motion to obtain relief from the automatic stay to obtain possession of the Home ("the Stay Motion"). The Stay Motion was also listed for a hearing on October 27, 1994.

The Debtor appeared on October 27, 1994, advising that she had independently hired Stacey L. Smith, Esquire ("Smith"), as substitute counsel for Keane, but that Smith was unavailable that day. The Trustee withdrew his motion because payments were current. However, Luff insisted on proceeding with the Stay Motion hearing that date and, being concerned that 11 U.S.C. § 362(e) required the court to proceed with a hearing that date or grant relief to Luff summarily unless Luff agreed to a continuance, we required the Debtor to proceed *pro se.*

At the conclusion of that hearing we entered an Order of October 28, 1994, upon "finding that the Debtor is current on monthly payments due to Luff and Trustee payments and may well be able to cure her other alleged defaults under the REISC," that

[t]he Debtor shall

a. Indicate in writing sent to Luff's counsel and the court in chambers whether she wishes to treat the REISC as a security agreement or an executory contract, *see In re Rowe,* 110 B.R. 712, 722–23 (Bankr.E.D.Pa.1990); and *In re Fox,* 83 B.R. 290, 302 (Bankr.E.D.Pa. 1988), and, if an executory contract, shall file and serve a motion to assume the REISC per the standards articulated in *In re Whitsett,* 163 B.R. 752, 755–56 (Bankr.E.D.Pa.1994), on or before November 14, 1994, and obtain an order allowing assumption of the lease on or about the scheduled confirmation hearing date.

b. Promptly achieve confirmation of a plan of reorganization.

c. Maintain all payments due to Luff and to the Trustee under the Debtor's proposed Chapter 13 Plan of Reorganization.

We should add that we considered these directives to be a tall order for the *pro se* Debtor, even with the assistance of recently-hired competent counsel, noting that her mother-in-law and husband, represented by separate competent, experienced bankruptcy counsel, were vigorously opposing her efforts.

On November 14, 1994, Smith commenced the task of fulfilling the conditions of the October 28, 1994, Order by sending an entry of her appearance to all parties on the mailing matrix and directing a letter to Luff and the court indicating her election to treat the REISC as a security agreement. Smith later appeared at a continued confirmation hearing of December 1, 1994, also scheduled per our Order of October 28, 1994, and indicated an intention to file an Amended Plan and/or objections to proofs of claims filed by Luff and Russell. In an Order of December 2, 1994, we directed that all amended plans and objections to claims be filed by December 12, 1994, and that a final confirmation hearing be conducted on January 12, 1995.

In accordance therewith, Smith did file Objections to Luff's and Russell's claims and a Motion to file the Amended Plan presently before us for confirmation ("the Plan Motion"). The Plan Motion, served on all creditors on the matrix, recited that the Debtor has lost her previous full-time job, but was obtaining support from Russell for their teenaged daughter and had obtained unemployment compensation and a part-time job sufficient to make payments of $203.02 to the Trustee for the remaining 53 months of the plan period. Amended Schedules I (Current

Monthly Income) and J (Current monthly Expenditures) were attached to the Motion. The payments to the Trustee were to be allocated to pre-confirmation and post-confirmation defaults of tax and insurance payments due to Luff under the REISC. No payments were now to be made to unsecured creditors.

Luff and Russell filed Objections to confirmation of the Plan, on December 27, 1994, and January 6, 1995, respectively, in accordance with the time strictures of Local Bankruptcy Rule ("L.B.R.") 3020.1, which provides that

> [a]ny Objections to confirmation of a debtor's ... modified Chapter ... 13 plan shall be filed in writing and served upon the debtor, the debtor's counsel, and the trustee within twenty-five (25) days after the meeting of creditors pursuant to 11 U.S.C. § 341 has been concluded, or within twenty-five (25) days after notice of the filing of the plan or modified plan as required by L.R.B. 3015.1 and L.B.R. 3019.1(a), whichever is later.

Luff's Objections provided as follows:

> 1. Debtor's Plan is not adequately funded to pay the claims of Dorothy Luff, Community Construction, a/k/a G & M Group as well as the Trustees [sic] commission.
>
> 2. Debtor's Plan is not feasible due to the Debtor's lack of income to meet the demands of an adequately funded Plan as well as obligations and expenses to be paid outside of the Plan.

Echoing Luff's Objections, Russell objected "on the grounds that the plan is not feasible. Debtor will not be able to make all payments under the plan and to comply with the plan."

On December 5, 1994, the Trustee filed another motion to dismiss this case because plan payments had not been made and the total of filed secured claims exceeded the payments contemplated under the Plan, rendering the Plan, in the Trustee's parlance, "infeasible." *See In re Fricker,* 116 B.R. 431, 436–37 (Bankr.E.D.Pa.1990) (discusses our Trustee's typical objections to feasibility as compared to "classic" feasibility objections per 11 U.S.C. § 1325(a)(6)).

On January 13, 1995, the Debtor, Luff, and Russell, and their respective counsel, all appeared, and all matters relevant to confirmation were seemingly at issue. Russell's counsel reported a resolution of his Objection to confirmation, ultimately effected by the Debtor's agreeing that he could pursue a state court divorce action, including issues relating to support, custody, and equitable distribution, if he withdrew his proof of claim and his Objection. Also, Luff's counsel agreed that Luff was only seeking arrearages recited at $5,814.36 in her pre-petition claim, not the entire secured claim of $82,000 designated in the proof of claim. This resolved the Trustee's feasibility objection.

However, also appearing for the first time in this case that day was Peter D. Delaney, Esquire, on behalf of a creditor identified as GM Group ("GM"). Delaney claimed that GM, an unsecured creditor of the Debtor and Russell in the amount of $19,000 in consideration for repairs made to the Home by a company related to GM, Community Home Improvement ("CMI"), had not received timely notice of the Debtor's bankruptcy filing or of the Plan and wished to assert certain objections to confirmation. When Delaney was unwilling to proceed to assert and try his objections on January 12, 1995, without a further opportunity to review the Debtor's Schedules and the Plan, this court, without ruling on whether GM would have been entitled to any extensions if the issue were submitted, entered an Order of January 13, 1995, providing that "any Objection to confirmation by a newly-discovered creditor, GM Group (?), represented by Peter Delaney, Esquire, shall be filed and served by January 20, 1995," and that "a *final* hearing on confirmation" and all related issues would take place on January 26, 1995.

The record indicates that GM filed "Objections to Confirmation" and a "Motion for Disallowing Debtor's Exemption Claim" on January 24, 1995, and January 26, 1995, respectively. The Objections state as follows:

> 1. The plan does not comply with the provisions of the Chapter 13 of title 11, in that: Debtor has a claim that is exempt in the amount excess of $30,000.00 which is

rightfully included in the plan as payment to the creditors secured and unsecured.

2. The plan submitted by the Debtor does not include payment at all to the unsecured Creditor, GM Group when in fact the Debtor has assets sufficient to pay all Creditors of the estate.

The Motion states that GM did not file an objection to the Debtor's exemptions in compliance with Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 4003(b), *i.e.*, within 30 days of the conclusion of the meeting of creditors on June 13, 1994, because it was not notified and therefore was unaware of the case until it received Smith's entry of appearance in November, 1994. GM specifically objected to the Debtor's claim that the annuity was exempt as not in accordance with 11 U.S.C. § 522(d)(11)(D) and this court's decision in *In re Sidebotham*, 77 B.R. 504 (Bankr.E.D.Pa.1987).

All parties and counsel appeared at the hearing of January 26, 1995, except the Debtor, who Smith reported was ill. However, although the Debtor's illness later became apparent from her speech, the parties agreed that the Debtor could present her testimony and be cross-examined by telephone from the Home. Technologically, this procedure was a success and the hearing proceeded smoothly in this fashion.

Heinz Schueller (the principal of GM and CHI), the Debtor, Luff, and Russell (putting in an appearance in support of his mother despite settlement of his own issues) all testified. It was established that Keane listed GM as "Community Construction, Green Lane, Levittown, PA." on the Schedules and matrix, but that Smith, in the entry of appearance and subsequent communications, corrected that creditor's address to "3710 Green Lane, Levittown, PA." Schueller testified that he received Smith's dispatches, but nothing in the case prior thereto. He further testified that he first consulted Delaney about the matter at the end of November or on "the first two days of December."

There was considerable disputed testimony regarding the physical location of GM/CHI and whether the address utilized by Keane, without the street number, should have been sufficient to allow GM to receive the notices

sent prior to Smith's participation in the case. There was also substantial testimony, portions of which were disputed, from the Debtor and Russell concerning the nature of the annuity and the Debtor's costs of maintaining her household.

Since none of these disputes need be resolved in order for us to render our decision, we will not describe this testimony in detail nor make specific findings regarding most of these disputes. *But see* pages 446–47 n. 4 for a general overview of these issues. What is undisputed about the annuity is that it resulted from the settlement of a tort action, in which both the Debtor and Russell were plaintiffs, arising out of the Debtor's fall in a Gimbel's department store on November 27, 1980, when she was six months pregnant with her and Russell's only child, their daughter. The settlement resulted in a lump sum payment of about $100,000, which liquidated all medical costs and attorney's fees, and annuity payments of $12,500 for ten years, from August 1, 1987, through (apparently) August 1, 1996. These payments were made to the Debtor only, and she contended that they were solely in consideration for lost wages, since she was working at the time of the accident and, having thereafter suffered from phlebitis and other complications which was nearly fatal, was unable to work for six or seven years thereafter. However, the only document produced reflecting the settlement, a Release and Agreement ("the Release"), signed by both the Debtor and Russell, expresses no allocation of the payments to any particular claims. The Release admitted into evidence was covered by a letter directed to the Debtor only. However, neither the Debtor nor Russell ever reported the annuity payments as income on any of their tax returns.

Much of the testimony focused on the Amended Schedules I and J filed by Smith with the Plan on December 12, 1994. The Debtor therein reported total monthly income of $1,419.42 from part-time employment and support and $1,536.32 in monthly expenditures, not counting her Plan payments of $203.02. Much of the testimony, consistent with the Objections of Luff and Russell as pleaded, tended to show that the Debtor had underestimated many of her ex-

penses, thereby further increasing the $300+ admitted monthly deficit of income as compared to expenses on Schedule J plus the Plan payments. However, the Debtor had received the August 1, 1994, annuity payment and had apparently utilized these funds to remain current on Plan payments and payments to Luff under the REISC. Smith stated that she did not list the annuity payment on Schedule I because it was claimed as exempt in the Debtor's original, unamended Schedule C.[1]

During the course of the hearing, Smith argued that GM's objections to the Debtor's exceptions were untimely and that, alternatively, the exemptions were nevertheless justified on the basis of 11 U.S.C. §§ 522(d)(10)(E), 522(d)(11)(D) (in part), and 522(d)(11)(E).[2] The Trustee did not press his Objections to confirmation, although he did express concern that Luff had not included post-confirmation defaults in her proof of claim. We believe that this deficiency can be cured by Luff's filing an amended claim (*see* page 448–49 *infra* for a discussion of the propriety of curing post-petition defaults in a plan) and that feasibility of the Plan, calling for over $10,000 in total payments, will not be

threatened by raising Luff's arrearages claim of $5,814.36 by about $3,000, to approximately $8,800. Being uncertain of precisely what objections were before the court and the law applying the rather arcane §§ 522(d)(10), (d)(11) Code provisions, we allowed the parties until February 10, 1995, to simultaneously submit briefs on all matters which they believed were in issue.

The Debtor, predictably, argued that GM's Objections, which she apparently believed had been filed on January 20, 1995, were nevertheless untimely, but that the exemption claimed in the annuity was proper to the extent allowed by § 522(d)(11)(D), and that either § 522(d)(10)(E) or § 522(d)(11)(E) justified exemption of the annuity's balance. No discussion of any of Luff's or GM's Objections to confirmation were included, possibly because of Smith's uncertainty as to what those Objections were.

Luff made two rather surprising arguments. The first related to the merits of the Debtor's exemption claims.[3] The second issue raised by Luff is

[w]hether the debtor's Amended Plan fails to comply with the requirements of 11

1. We disagree with Smith's apparent analysis that income which is exempt under § 522(d) need not be listed on Schedule I. *See In re Hagel*, 171 B.R. 686, 687 (Bankr.D.Mont.1994); *In re Morse*, 164 B.R. 651, 653–55 (Bankr. E.D.Wash.1994); and *In re Schnabel*, 153 B.R. 809, 813–16 (Bankr.N.D.Ill.1993).

2. These sections provide, not considering the amendment to § 522(d)(11)(D) applicable only to cases filed after October 22, 1994, *see* Bankruptcy Reform Act of 1994, § 702(b)(1), as follows:
   (d) The following property may be exempted under subsection (b)(1) of this section:

   (10) The debtor's right to receive—

   (E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—
   (i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;
   (ii) such payment is on account of age or length of service, and
   (iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986.

   (11) The debtor's right to receive, or property that is traceable to—

   (D) a payment, not to exceed $7,500, on account of personal bodily injury, not including pain and suffering or compensation for actual pecuniary loss, of the debtor or an individual or whom the debtor is a dependent; or
   (E) a payment in compensation of loss of future earnings of the debtor or an individual of whom the debtor is or was a dependent, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor.

3. In one sense, any discussion by Luff of exemption claims is surprising, because Luff, apparently recognizing that same would have been untimely if raised any time after July 13, 1994, filed no objections to the Debtor's exemptions at any time. However, Luff's arguments in favor of GM's Objections to the Debtor's exemptions are not surprising when one considers remarks made by Delaney at the January 26, 1995, hearing, in which he indicated that he was "not claiming to be the wizard of bankruptcy which I think [Luff's counsel] is." From these remarks, we infer that Luff's counsel is, through the medium of GM, which fortuitously may not have received notice of certain events in the bankruptcy, the driving force for these Objections. GM's position as a vigorous objector to the Debtor's Plan is also

U.S.C. Sec. 1325(4) [sic—the reference is apparently, to § 1325(*a*)(4)] in that the value of the property to be distributed under the plan on account of each allowed unsecured claim is less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7....

This claim that the Debtor has excessive assets which should be subject to distribution is quite a contrast to the objections sounding in 11 U.S.C. § 1325(a)(6) infeasibility claims which she raised in her Objections, quoted at page 441 *supra*.

GM, in its Brief, submitted belatedly by permission of the court, echoes Luff's arguments regarding the exemptions. As to the timeliness of these Objections, GM states that it

initially was not notified of any Bankruptcy proceeding in this matter.... Upon learning of the filing of the Bankruptcy case, the Creditor attended the next scheduled hearings in January of 1995, made its present [sic] known and filed its Objections to the Plan and claimed Exception pursuant to the Court's Order directing they file by January 20, 1995.

The record, however, belies GM's claim of a January 20, 1995, filing, and no extension to make *these* filings was requested or of course could therefore have been granted by this court.

## C. DISCUSSION

### 1. *SINCE GM'S OBJECTIONS TO CONFIRMATION AND TO THE DEBTOR'S EXEMPTIONS WERE NOT FILED BY JANUARY 20, 1995, THEY WERE NOT TIMELY AND WILL NOT BE CONSIDERED ON THEIR MERITS.*

■ In *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643–46, 112 S.Ct. 1644, 1648–49, 118 L.Ed.2d 280 (1992), the Court articulated a bright-line ruling that the deadline allowed for creditors and other interested parties to object to exemptions claimed by debtors set forth in F.R.B.P. 4003(b) must be strictly construed. The failure of Luff, or for that matter Russell, the Trustee, and all other parties admittedly notified of the deadlines for filing exemptions, to in fact object to the claims of exemptions within that period bars such objections.

■ We do not agree with an argument suggested by Luff that the claims of exemptions included by the Debtor, per Keane, on Schedule C, are so vague as to fail to meet her alleged burden to make the exemption claims relating to her annuity with adequate specificity, citing authority, *Payne v. Wood*, 775 F.2d 202 (7th Cir.1985), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); and *In re Wiford*, 105 B.R. 992 (Bankr.N.D.Okla.1989), which does not appear on point. Although the term "annuity" is itself misspelled on Schedule C, it is clear that the Debtor claims all proceeds payable under the annuity to be exempt. If Luff or any other interested party believed this claim to be too vague, a timely objection on the ground of vagueness would have been appropriate.

■ The contention of GM that it failed to receive notice because Keane neglected to adequately record the correct name of its related loan company or record its full address on the Schedules does raise an issue which has due process implications. It does appear, however, from the geographical testimony that GM/CHI's place of business in the only block of Green Lane in Levittown, plus the absence of any indication that any notices

somewhat surprising in the sense that it still maintains a claim against Russell, who is not a debtor and, with the Debtor and Russell in the midst of divorce, the collectability of its claim against particularly the Debtor is doubtful in any event. However, instead of pursuing Russell, GM has apparently joined Luff (and Russell) in pursuing the Debtor. We also note that Luff is the mother-in-law of the Debtor and the grandmother of a teenager housed in the Home. However, her first loyalty is apparently to defend her

son, who now resides in her home, in his domestic-relations-oriented dispute with the Debtor. The fact that all of the objectors are "ganging up" on the Debtor for no apparent reason but to support Russell in this domestic relations dispute with the Debtor renders us less than sympathetic to, and unwilling to grant any dispensations to, this tag-team of objectors, recalling that Luff gave no dispensation to the Debtor when she appeared *pro se* at the October 27, 1995, hearing on the Stay Motion.

sent to it were returned, could create an inference that GM did in fact receive at least some of these notices.

However, Schueller's testimony that no notices were received by GM prior to November, 1994, appeared credible, especially when juxtaposed with his possibly damaging admission that he not only received notices sent by Smith on November 14, 1994, with the complete address, but also advised his counsel of these notices as early as late November, creating an additional problem for GM of failing to explain its delay in acting between mid-November, 1994, and mid-January, 1995.

■ A notice addressed in a manner which is not sufficiently specific to assure that the creditor would have received it may result in non-enforcement of a bar date recited in the notice against that creditor. *Cf. In re Main*, 157 B.R. 786 (W.D.Pa.1992). However, the fact that notice was not actually received was not conclusively established in this record. *Cf. In re Poole*, 177 B.R. 235, 241 (Bankr. E.D.1995) (reasoning of *Main* is totally inapplicable where creditor received actual notice of the bankruptcy filing prior to the bar date).

As explained in *In re Greenburgh*, 151 B.R. 709, 712–13 (Bankr.E.D.Pa.1993), this court has enacted L.B.R. 1009.1(b), which provides as follows, to address many of the problems which arise when a creditor is omitted in consumer bankruptcy cases:

> An amendment adding a creditor to the debtor's Schedules shall be served upon that creditor. If the creditor is added after the notice of the Section 341 meeting has been mailed, a copy of the notice of the Section 341 meeting, and any other notices which have been served upon all creditors in the case, shall be served by the debtor's counsel on the added creditor simultaneously with the amended document.

This Rule provides that omitted creditors will receive a notice which advises them of their right to, and presumably will allow them to, make the objections to the debtor's exemptions, as well as to the debtor's discharge or dischargeability of that creditor's particular debt, within the time frame after the bar date which is normally allowed to creditors to do so. *See Greenburgh, supra*, 151 B.R. at 712–13. *See also In re Szczepanik*, 146 B.R. 905, 911–12 (Bankr.E.D.N.Y.1992); and *In re Behimer*, 119 B.R. 667, 671 (Bankr.W.D.Ark. 1990) (extended time deadlines to file objections provided to omitted creditors by court decisions rather than by local rule).

At the hearing of January 12, 1995, this court was mindful of the problems which are created by the omission of, or inadequate notice to, creditors in Chapter 13 bankruptcy cases. We were also mindful that there are competing considerations regarding the rights of debtors to breathe easily after bar dates pass which must be weighed against the rights of omitted creditors to raise issues which they have no reason to know exist. For example, this court has ruled that actual notice of a bankruptcy case is implied notice of deadlines in that case irrespective of receipt of the actual notice of the bar dates. *See In re Goldstein*, 123 B.R. 514, 518 (Bankr.E.D.Pa.1991), and cases cited therein. *See also In re Christopher*, 28 F.3d 512, 515– 19 (5th Cir.1994). On the other hand, it has been held that, if a creditor has no actual notice of a bankruptcy filing nor has it received the prescribed notice of the bar dates, *no* deadlines whatsoever apply. *See In re Santiago*, 175 B.R. 48 (9th Cir. BAP 1994) (actual knowledge of the bankruptcy filing 19 months before a dischargeability complaint was filed did not bar the complaint where no bar date for that creditor was established).

This court, during the course of the hearing of January 12, 1995, was made aware that the issue of whether GM had actual notice of the bankruptcy was disputed. It was also quite aware of its own Order establishing the January 12, 1995, hearing as a final hearing on confirmation in a case which, due to Keane's unexpected incapacity and subsequent failure to obtain substitute counsel, and the contentiousness of Luff and Russell, and now GM as well, had already lingered without a decision on confirmation for far too long.

■ The Order of January 13, 1995, the most significant contents of which had already been orally communicated to the parties on January 12, 1995, was that a new,

special bar date of January 20, 1995, to file and serve any objections was created for GM only. In one sense, the Order established a very short bar date for GM. However, the court believed it to be necessary for the Debtor to have at least a few days' notice of what objections to confirmation were to be raised to prepare for the final confirmation hearing. Furthermore, allowing any extension to file at that point gave GM the advantage of voicing an objection at a late, crucial stage in the proceedings, when all of the issues had been well-developed, and equipped with Luff's counsel as a well-oriented consultant. *See* page 443–44 n. 3 *supra*. The pleadings requirements for objections are not demanding: a page or two which simply states the objection will suffice.

■ For all of these reasons, we find that the January 20, 1995, bar date established in the January 13, 1995, Order must be construed in the spirit of the Supreme Court's *Taylor* decision, *i.e.*, strictly against GM. Despite the fact that the Debtor, possibly being unaware of the issue because of the rush of activity in the last week before the January 26, 1995, hearing, did not raise the issue, GM's Objections to confirmation and its Motion in the nature of Objections to the Debtor's exemption claims are tardy because they were not filed by the January 20, 1995, bar date. Nor were they even filed by the next business day thereafter, January 23, 1995. Instead, they were not filed until January 24, 1995, and January 26, 1995, respectively. These filings were beyond the "compromise" bar date established on the January 13, 1995, Order, and hence were simply filed too late to be considered.

■ We further note that the facts as developed at the January 26, 1995, hearing, established that granting any dispensation to GM may have been unjustified. It was developed at that hearing that GM received actual notice of the Plan Motion and the Plan, since they were filed and served on all creditors by Smith on December 12, 1994. The time limit for filing Objections to the Plan had therefore expired, pursuant to the terms of L.B.R. 3020.1, quoted at page 441 *supra*, on January 7, 1995. However, we had no knowledge of GM's receipt of the Plan Motion and the Plan on January 12, 1995. And, once our Order of January 13, 1995, was entered, GM became the beneficiary of a new personalized bar date of January 20, 1995, whether it was entitled to it or not. Since it now appears that it had no such just entitlement, GM can hardly complain if we enforce the undeserved dispensation granted to it in our January 13, 1995, Order strictly against it.

■ We therefore deny all of GM's Objections to confirmation and to the Debtor's claimed exemptions as untimely filed. Consequently, we need not reach the merits of these Objections.[4]

4. We note that a decision on the merits would have been rather difficult, but probably we would have come to a result in favor of the Debtor in any event. Our broad reading of § 522(d)(11)(D) in *Sidebotham, supra*, 77 B.R. at 506, as covering any claim including bodily injury, renders that Code section clearly applicable. However, that section only would cover $7,500 of the $30,000 annuity claimed as entirely exempt.

The Debtor's testimony, which appears more precise and hence we deem more credible than that of Russell regarding the specifics of the Debtor's own work history and the nature of the tort settlement, supports the Debtor's contention that the annuity payments do represent "compensation of loss of future earnings" within the scope of § 522(d)(11)(E). While we recognize that no firm allocation of the settlement proceeds was made, the fact that (1) the initial lump sum payment covered most, if not all damages other than the Debtor's considerable lost wages; (2) the Debtor in fact suffered a substantial wage loss as a result of her injuries; and (3) the

payments were made to her personally, make such an allocation reasonable and acceptable. The fact that neither the Debtor nor her husband reported the annuity payments as income on their tax returns is not conclusive. There is no evidence that either the Debtor or Russell ever seriously contemplated their potential tax liability for these payments, irrespective of their nature.

The full amount of the benefits of the annuity appears reasonably necessary for the support of the Debtor and her daughter. Indeed, Luff and Russell argued, in their written Objections to confirmation and in much of the evidence with they submitted at the hearing of January 26, 1995, *see* pages 441, 442–43 *supra*, that the Plan was not feasible due to the paucity of the Debtor's income, even considering that the annuity payment of August 1, 1994, was available to, and expended by her. No party, including GM, has argued that the Debtor is not able to satisfy the "necessity for support" prong of § 522(d)(11)(E), and the similar prong of § 522(d)(10)(E). *Com-*

2. *SINCE THE ONLY OBJECTIONS TO CONFIRMATION NOW ARGUED BY LUFF WERE NOT ASSERTED AMONG HER TIMELY–FILED OBJECTIONS, THEY MUST BE CONSIDERED BELATEDLY–FILED AND ARE REJECTED FOR THAT REASON, AS WELL AS ON THEIR MERITS.*

■ Since Russell's Objection to confirmation was withdrawn and GM's Objections to confirmation and to the Debtor's claimed exemptions have been denied as untimely filed per the discussion at pages 444–46 *supra,* all that remains for consideration are Luff's timely filed Objections to confirmation. Unfortunately for Luff, her filed Objections and the objections argued by her in her post-trial brief are completely different. We are therefore left, by this internal inconsistency, to conclude that, on one hand, Luff has, in her briefing, abandoned or at best recognized the weaknesses of the filed Objections and, on the other hand, had attempted to assert, in her brief, objections which were arguably waived by her failure to raise same through filings within the time deadlines set forth in L.B.R. 3020.1.

The issues briefed by Luff are that (1) the Plan violates 11 U.S.C. § 1325(a)(4) because the Debtor has therein failed to liquidate an equity in the Home which would be liquidated in a Chapter 7 case in light of the difference between the $177,000 (or $179,000) value of the Home set forth on Schedule A and Luff's $82,000 total secured claim, or to liquidate a $400 bank account balance listed on Schedule B but not claimed as exempt on Schedule C; and (2) the Debtor's effort to cure, in the Plan, post-petition real estate tax, property insurance, and water and sewer bills (collectively "the Tax Payments") owed to Luff is violative of 11 U.S.C. § 1322(b)(5). It is noteworthy that none of these issues were raised, either expressly or by implication, in Luff's filed Objections, quoted at page 441 *supra.* As a result, the Debtor could hardly have been prepared to meet these objections with evidence at the confirmation hearing. Moreover, at the confirmation hearing, much of the evidence which

---

pare *In re Rockefeller,* 100 B.R. 874, 877–78 (Bankr.E.D.Mich.), *aff'd,* 109 B.R. 725 (E.D.Mich.1989) (only $24,000 of $30,000 annuity found necessary for debtor's support; by comparison, the instant annuity is only $12,500). On its face, § 522(d)(10)(E) appears to be a clearly applicable alternative basis for the exemption claim in issue, as it appears to apply to any "annuity ... on account of ... disability." The benefits are an annuity received on account of a disability. None of the provisos of § 522(d)(10)(E) are claimed to be applicable. This Code section does not appear, on its face, to require that the annuity benefits be restricted to payments in lieu of future earnings, which is the closest issue raised as to whether § 522(d)(10)(E) is applicable.

However, referencing the pertinent legislative history, H.R. REP. NO. 595, 95th Cong., 1st Sess. 362, 1978 U.S.Code Cong. & Admin.News pp. 5787, 6317, 6318 (1977), Collier describes the § 522(d)(10) exemptions generally as "benefits akin to future earnings." 3 COLLIER ON BANKRUPTCY, ¶ 522.29, at 522–26 (15th ed. 1994). Several courts have accordingly refused to apply this exemption section to structured tort settlements under comparable state laws enacted in lieu of and comparable to § 522(d). *See In re Corbi,* 149 B.R. 325, 331 (Bankr.E.D.N.Y.1993); *In re Rhinebolt,* 131 B.R. 973, 976–77 (Bankr. S.D.Ohio 1991); *In re Johnson,* 108 B.R. 240, 242–44 (Bankr.D.N.D.1989); and *In re Simon,* 71 B.R. 65, 66–67 (Bankr.N.D.Ohio 1987). *But*

see *In re Ziegler,* 156 B.R. 151, 154 (Bankr. W.D.Pa.1993) (§ 522(d)(10)(E) exemption allowed as to a structured tort settlement without an extended discussion). The "plain meaning rule" of Bankruptcy Code interpretation championed in such cases as *Patterson v. Shumate,* 504 U.S. 753, 757–60, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992); *Taylor, supra;* and *United Bank v. Wolas,* 502 U.S. 151, 154–60, 112 S.Ct. 527, 529–33, 116 L.Ed.2d 514 (1991), would appear to support *Ziegler's* reading of § 522(d)(10)(E). In any event, our discussion of § 522(d)(11)(E) supports the conclusion that the instant annuity *was,* in any event, provided in lieu of, and hence is akin to, future earnings. The "necessary for support" issue discussed in reference to § 522(d)(10)(E) analysis is equally applicable here.

Since the burden of proving the validity of an objection to a claimed exemption lies on the objector, *see* F.R.B.P. 4003(c); *In re Kobs,* 163 B.R. 368, 370 (Bankr.D.Kan.1994); *In re Shurley,* 163 B.R. 286, 289 (Bankr.W.D.Tex.1993); *Rhinebolt, supra,* 131 B.R. at 975 (references a § 522(d)(10)(E) claim); and *In re Cramer,* 130 B.R. 193, 195 (Bankr.E.D.Pa.1991) (references a § 522(d)(11)(E) claim), and exemption laws are to generally be liberally construed in favor of claimants, *see, e.g., Rhinebolt, supra,* 131 B.R. at 975; and *Sidebotham, supra,* 77 B.R. at 506, it is very likely that we would have upheld the Debtor's claimed exemption of the $30,000 under §§ 522(d)(10)(E) or 522(d)(11)(E) had we been compelled to reach that issue.

Luff did present was in apparent support of her filed Objections contending that the Debtor had insufficient income and underestimated expenses which presented an issue regarding the feasibility of the Plan under 11 U.S.C. § 1325(a)(6). The feasibility argument suggests a contention that the Debtor lacked sufficient liquid assets to fund the Plan, an argument which appears, to a large degree, inconsistent with a claim that she has excessive assets that could be liquidated to pay her creditors. As a result, the Debtor could not have possibly anticipated the arguments now raised by Luff for the first time in her post-hearing brief, and is greatly prejudiced by her inability to muster evidence or submit a brief in opposition thereto.

▮ In any event, the § 1325(a)(4) arguments raised by Luff are not convincing. The presence of a $400 non-exempt bank account is *de minimis* and, especially when untimely raised for the first time at such a late juncture, will not be allowed to derail an otherwise confirmable plan.

▮ The liquidity of the Debtor's alleged equity in the Home is clearly illusory because it is rather clear that the Debtor's interest in the Home is not marketable. As Luff well knows, in light of the fact that the Debtor's interest in the Home arises out of the REISC to which she is the contracting party, title to the Home remains in Luff and will so remain until the entire $82,000 claim of Luff under the REISC is liquidated.

Furthermore, the Debtor's interest in the Home is shared by the entireties with Russell. Although the Debtor and Russell have agreed to allow the state court of applicable jurisdiction resolve all of their domestic relations issues, among which is equitable distribution of all of their assets including their interests in the Home, this agreement is little more than an agreement to disagree, and to take their disagreements elsewhere for resolution. Russell's presence as a co-resident with the Debtor's most persistent adversary, his mother Luff, and his testimony against the Debtor at the confirmation hearing, make it clear that he remains the Debtor's adversary. It appears unlikely that he, Luff, and the Debtor will readily reach an agreement regarding their respective interests in the Home. This issue is almost certain to remain a hotly-contested matter in the equitable distribution determination and involves property of sufficient value to become a dominant issue in the resolution of all of their domestic disputes. As far as we know, the state court has yet to begin to address these issues and their resolution may extend for years, *i.e.*, as long as the entire plan period in this case.

In sum, it is difficult to understand why a hypothetical Chapter 7 trustee would even attempt to market the Debtor's interest in the "equity" that she and Russell have in the Home. It is unclear whether a sale under 11 U.S.C. § 363(h) could or would be attempted. Thus, Luff's simplistic analysis that the Debtor "owns" a half-interest in a $95,000 equity ($177,000 value subject to Luff's own $82,000 secured claim) is totally misplaced in a § 1325(a)(4) analysis under the present facts. Therefore, Luff's § 1325(a)(4) objections, even if properly raised, could not possibly have been sustained.

▮ We also disagree with Luff's assertion in her brief, unsupported by any citation of authority, that "the Bankruptcy Code prohibits a Chapter 13 Plan from undertaking to cure a post-petition default although the Court may give a debtor time within which to bring post-petition arrearages current under 11 U.S.C. Sec. 1322(b)(5)." In fact, 11 U.S.C. § 1322(b)(5), provides for "the curing of *any* default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; ..." (emphasis added). At the outset, we note that the fact that arrearages are post-petition does not necessarily render the arrearages a post-petition *claim*. It is not clear that the amount of arrearages in default on a long-term obligation is ever the equivalent of a "claim." *See In re Vitelli*, 93 B.R. 889, 894–95 (Bankr.E.D.Pa.1988); and *In re Small*, 65 B.R. 686, 690 (Bankr.E.D.Pa.1986), *aff'd*, 76 B.R. 390 (E.D.Pa.1987). Furthermore, post-petition "claims" can be filed in Chapter 13 cases, *see* 11 U.S.C. § 1305(a)(2), and there-

fore can be liquidated in Chapter 13 plans. Therefore, it is well-established that post-petition defaults in long-term obligations can be cured in Chapter 13 plans under § 1322(b)(5). *See In re Hoggle,* 12 F.3d 1008, 1010–11 (11th Cir.1994); and *In re Ford,* 84 B.R. 40, 44 (Bankr.E.D.Pa.1988), and cases cited therein.

Moreover, even if it were found that the Debtor's attempt to cure the post-petition delinquencies in making the Tax Payments were impermissible under § 1322(b)(5), a debtor is authorized, by 11 U.S.C. § 1322(b)(3), to "provide for the curing or waiving of *any* default." (emphasis added). In *Ford, supra,* 84 B.R. at 44, this court expressly permitted the debtor to cure post-petition payment defaults on her mortgage under § 1322(b)(3), since the last payment on the obligation in issue in that case fell due during the plan period. In light of the fact that the Debtor has remained current on her monthly payments due to Luff under the REISC, it appears to this court that these delinquencies are modest and should be deemed curable in the Debtor's Plan.

Furthermore, it is not clear when the payments made by Luff on account of the Tax Payments became due, and hence whether they all were post-petition, as opposed to pre-petition obligations; when Luff paid them; and when Luff made demand on the Debtor for reimbursement for their payment. At trial, Luff testified that she paid $2,500 for taxes, $400 for insurance, and $90 for water and sewer post-petition. However, no bills were produced, nor was testimony provided as to precisely when these bills fell due.

As to when Luff made demand upon the Debtor for reimbursement for the amount of the bills, there was testimony from the Debtor at the hearing of October 27, 1994, that Luff had never provided copies of the bills, which were directed to Luff as record owner of the Home, nor advised her of the amount of the bills, nor made any demands for repayment to her, as of that date. At the confirmation hearing on January 26, 1995, Luff testified that she had subsequently wrote a letter to the Debtor demanding the post-petition payments on *January 15, 1995.* This date was of course three months after the October hearing when the Debtor had stated that she had never received them; subsequent to the originally-scheduled date of the final confirmation hearing of January 12, 1995; and would have been received by the Debtor less than ten days prior to the confirmation hearing of January 26, 1995. It is also unclear whether, even at that time, Luff provided documentation in the form of bills and/or receipts to the Debtor.

In light of all of the forgoing, the Debtor's failure to pay whatever post-petition Tax Payments fell due is quite understandable. Such delinquencies, which appear to have been induced by Luff, cannot be viewed as substantial. We find that the right to cure these delinquencies is permissible in the Plan under §§ 1322(b)(5) or (b)(3).

To the extent that Luff has not withdrawn her § 1325(a)(6) feasibility objections, we conclude that these objections lack merit. With the $1,000 monthly from the annuity added to the Debtor's other income from part-time employment and support, her monthly income exceeds $2,400. *See* pages 442–43 *supra.* The probable additional expenses of the Debtor brought out by Luff and Russell at the hearing amount to about $500 or $600 monthly, raising the Debtor's total monthly expenditures to between $2,000 and $2,200. *Id.* The Debtor's income would appear sufficient to cover expenses in this amount.

As we noted in *In re Oglesby,* 150 B.R. 620, 627–28 (Bankr.E.D.Pa.), *remanded on other grounds,* 158 B.R. 602 (E.D.Pa.), *reinstated,* 161 B.R. 917 (Bankr.E.D.Pa. 1993), *aff'd,* C.A. No. 94–0617 (E.D.Pa. April 7, 1994), citing and quoting from *In re Capodanno,* 94 B.R. 62, 64–66 (Bankr.E.D.Pa. 1988), the feasibility requirement set forth in § 1325(a)(6) is not rigorous. *Cf. e.g., In re Mayer Pollock Steel Corp.,* 174 B.R. 414, 420–21 (Bankr.E.D.Pa.1994), and cases cited therein (feasibility requirement is not rigorous in Chapter 11 cases as well). We noted, in *Oglesby,* our strong inclination to give almost all Chapter 13 debtors at least a *chance* to save their homes in Chapter 13

plans, even when their post-petition, as well as pre-petition, payment performances have been very poor, because a case featuring an unfulfilled plan can be readily dismissed or converted. 150 B.R. at 628. The *Oglesby* debtor was, notably, also pursuing her fourth case, after three failures at achieving confirmation. *Id.* at 622.

The instant Debtor has apparently filed only this one case, and her payment performance has been no worse than adequate, despite the apparent failure of her initial counsel Keane to be a great deal of help in advising her of her duties and responsibilities. We therefore readily conclude that the Debtor's instant Plan is feasible.

■ The Objections of GM to confirmation, quoted at pages 441–42 *supra,* echo their Objections to the Debtor's exemption claims and the § 1325(a)(4) "presence of assets" Objection raised by Luff in her post-trial brief. We assume *arguendo* that we have at least a limited duty to consider these or any other potential objections to confirmation of Chapter 13 plans *sua sponte. See In re Gurst,* 76 B.R. 985, 989 (Bankr.E.D.Pa. 1987). *Cf. In re Richard Buick, Inc.,* 126 B.R. 840, 846 (Bankr.E.D.Pa.1991) (court has a duty to preclude confirmation of a Chapter 11 plan which contains significant deficiencies). *But see In re Szostek,* 886 F.2d 1405, 1410–12 (3d Cir.1989) (provisions of § 1325(a) are not mandatory and hence their satisfaction need not be considered *sua sponte* by a bankruptcy court); and 5 COLLIER, *supra,* ¶ 1325.01, at 1325–4 (court has the discretion to confirm a plan which does not conform with § 1325(a), particularly if no party objects). In any event, we find, for the reasons stated herein at pages 25–31 *supra,* that the Debtor has met her burden, as set forth in *Fricker, supra,* 116 B.R. at 437–38, to prove that, no just impediments to confirmation of the Plan exist.

### D. CONCLUSION

Since the Debtor's claims of exemptions are not subject to timely objections, and no objections to confirmation of the Plan appear either timely raised or meritorious, the Plan will be confirmed.